| | |
|---|---|
| John Doe, | Case No. 24-cv-01392 (NEB/DTS) |
| Plaintiff, | |
| v. | |
| Hennepin County; Hennepin Healthcare System, Inc.; Laura Sloan, M.D., *in her individual capacity*; Minnesota Department of Human Services Commissioner Jodi Harpstead, *in her official capacity*; KyleeAnn Stevens, M.D., *in her individual capacity*; and Jane Doe 1, *in her individual capacity*, | **MEMORANDUM SUPPORTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

## <u>INTRODUCTION</u>

Plaintiff suffers from a serious mental illness and has been languishing for almost a year at the Hennepin County Adult Detention Center ("ADC"). State Defendants[1] know this. On January 8, 2024, Plaintiff was committed to the custody and care of the Minnesota Department of Human Services ("DHS") for mental health treatment. DHS has been provided the jail and medical records that chronicle Plaintiff's mental illness and the suffering he has endured while detained at the ADC. State Defendants know that jail is an

---

[1] "State Defendants" as used herein refers to Defendants Harpstead (in her official capacity as DHS Commissioner), Stevens (the Executive Medical Director of DHS' Direct Care and Treatment Division), and Jane Doe 1 (the DHS employee individually responsible for admitting Plaintiff into a DHS facility).

inappropriate place to house mentally ill individuals. They know that the conditions of jail confinement are not only contra-therapeutic but can damage mentally ill individuals like Plaintiff.

Nonetheless, four months have elapsed since Plaintiff was committed to DHS' custody and care, but he remains at the jail. State Defendants have neither transferred him to a DHS treatment facility as ordered by a Minnesota district judge, nor provided any treatment in the jail. DHS accepted the court's commitment of Plaintiff to its custody and care. In so doing, it accepted the obligation to ensure Plaintiff's due process rights are respected. This includes Plaintiff's right to be free from pretrial punishment and to adequate medical care, among other rights. State Defendants have violated and continue to violate those rights, however, by refusing to transfer him to the appropriate DHS facility. To cure these ongoing constitutional violations, Plaintiff respectfully requests that the Court issue an injunction requiring that DHS admit him into the appropriate facility within 72 hours of the issuance of the injunction.

## FACTUAL BACKGROUND

Plaintiff is an individual with a serious mental illness currently detained at the ADC. Plaintiff was arrested in on June 13, 2023, after allegedly assaulting his father. Ex. A at 4.[2] He was charged with Second-Degree Assault and processed into the ADC. *Id.* Plaintiff has a history of diagnosed mental illness, including bipolar disorder. Ex. A at 4.

_____

[2] References to "Exhibit" or "Ex." in this Memorandum refer to the Exhibits to the Declaration of Kevin C. Riach filed in support of Plaintiff's Motion for Preliminary Injunction.

On July 26, 2023, Plaintiff was deemed incompetent to proceed in his criminal case due to his mental illness, and he was referred for civil commitment proceedings. On August 7, 2023, Hennepin County petitioned for Plaintiff to be civilly committed. Ex. A at 2. On January 8, 2024, Hennepin County district court judge Michael Browne civilly committed Plaintiff to DHS custody.[3] Specifically, the court committed Plaintiff "to the Head of the Minnesota Security Hospital," and ordered that, "the head of the treatment facility to which [Plaintiff] has been committed shall hold [Plaintiff] safe and secure for the period of commitment . . . ." Ex. A at 12. The court's order explains, "Respondent is in need of a treatment plan with close supervision by mental health professionals and sufficient safety measures to protect himself and others." Ex. A at 8.

In a mental health evaluation filed on March 7, 2024, DHS psychologist Dr. Jennifer Harrison opined, "it is my professional opinion that [Plaintiff] remains in need of further care and treatment in a structured and supervised setting that is able to address his treatment needs while also providing for his safety and the safety of others within a secure environment . . . [he] is currently in need of long-term support and oversight with treatment aimed at the development of healthy coping skills prior to reintegration into the community." Ex. B at 32. She further opined, "it is my professional opinion that [Plaintiff] remains in need of treatment in a setting that offers structure and consistency in

<hr>

[3] DHS oversees the Forensic Mental Health Program – formerly known as the Minnesota Security Hospital – through its Direct Care and Treatment ("DCT") division. Ex. F, ¶ 1. Defendant Stevens is the Executive Medical Director of DCT, with ultimate responsibility for ensuring proper placement of committed individuals in DCT facilities, including Plaintiff. Ex. F, ¶ 8.

programming, supervision, and oversight, and access to support from a multidisciplinary treatment team." Ex. B at 32.

Though Plaintiff was committed to DHS in January, he is still housed at the ADC. There is no treatment plan in place for Plaintiff, and he is receiving no treatment or programming beyond the provision of anti-psychotic medication. *See* Ex. B at 23-24. Plaintiff was housed in solitary confinement at the ADC from his arrest on June 13, 2023 until April 22, 2024 – five days after he filed the Complaint in this matter – at which point he was moved out of solitary confinement and finally allowed out of his cell for several hours per day and to associate with other jail inmates. *See* Ex. C at 175 (noting initial placement in "ASM" or "administrative segregation – medical" on June 13, 2023), 220 (noting that Plaintiff was "reclassified" out of administrative segregation on April 22, 2024).

Jail is no place for the mentally ill. As DHS recently admitted: "too many people with mental illnesses in jails, hospitals, and the community wait, sometimes for weeks or months, for admission to intensive state-operated services . . ." Ex. D at 7. There is general agreement in the psychiatric community that jails are especially ill equipped to treat mental illness, even when compared to prisons. The stressful environmental conditions and absence of appropriate treatment in a jail setting can place individuals like Plaintiff with a serious mental illness at risk of psychiatric decompensation (*i.e.*, re-emergence or worsening of symptoms, such as delusions, hallucinations, manic episodes, severe depression, suicidal ideation or attempts), as Plaintiff's experience demonstrates. ECF No. 2-1 at 4.

Moreover, individuals with serious mental illness, like Plaintiff, are particularly vulnerable to negative outcomes in the jail environment. The chaotic and anti-therapeutic environment of the jail setting, paired with the lack of appropriate resources and obstacles to health care access (*e.g.*, security reasons, segregation) cause many individuals with pre-existing serious mental illness to experience psychiatric decompensation, which results in the re-emergence of symptoms such as psychotic disorganization, hallucinations, delusions, poor self-care (e.g., not showering or eating), aggression in the context of paranoid beliefs, and self-injury or suicide attempts. *Id.* at 6.

Individuals with serious mental illness in jails are also more likely to be victimized by other incarcerated individuals, more likely to have difficulty following rules resulting in disciplinary action and segregation, more likely to be subjected to uses of force by correctional staff, and more likely to engage in self-harming behaviors and die by suicide. *Id.* at 6. For these reasons, among others, individuals evaluated during the jail intake screening who require acute mental health services beyond those offered in the facility, including psychiatric hospitalization, should be transferred to an appropriate facility in a timely manner. *Id.* at 7.

Individuals with serious mental illness who are not transferred from jail to an appropriate facility in a timely fashion can be traumatized and permanently harmed. Lack or delayed access to appropriate care for individuals experiencing acute psychiatric symptoms in jails can result not only in psychological distress and suffering (*e.g.*, hearing voices of negative content, being afraid that people are out to hurt you, having ruminative thoughts about suicide) but can also have long term negative consequences. Ex. 1 at 8.

Plaintiff has suffered and continues to suffer injury from being incarcerated at the jail rather than receiving treatment at an appropriate health care facility. He experienced a months-long psychotic break well-catalogued in his jail and medical records. He received no treatment during these months while he was floridly psychotic other than the occasional, clearly futile offering of medication by mental health staff. *See generally* Ex. E at 108-122. On August 14, 2023, after Plaintiff had been decompensating at the jail for several months, Defendant Laura Sloan, M.D., a forensic psychiatrist who works at the ADC, wrote in Plaintiff's medical record:

> Plaintiff has languished in jail for 2 months with psychosis and symptoms of mania including disorganized behavior, delusions, disorganized speech, staying up all night, poor self care and pressured speech. Deputies have expressed concern for limited food and fluid intake and have been concerned for "malnourishment." Today Plaintiff is thin, disheveled and malodorous. He is agitated, irritable and interacts minimally with me, only cursing and yelling at me. Deputies indicate that he continues to ramble nonsensically, make odd gestures, and remain naked much of the time.

Ex. E at 95.

Four days later, a mental health nurse at the jail visited Plaintiff and noted:

> Observed dried vomit on floor next to his bed. Trash/empty wrappers in sink and on floor. Cell floor is unkempt and filthy. Plaintiff looked pale and weak. When writer asked him to come to his cell door, he refused due to possible weakness. He has been lying in bed most of the day. Pt. has a flat affect and poor eye contact. Pt is paranoid and disorganized.

Ex. E at 108.

In February and March of this year, Plaintiff again decompensated while being held in solitary confinement. This time he flooded his cell and was exposed to raw sewage, in addition to experiencing another extended episode of untreated psychosis. Ex. C at 214.

Plaintiff was finally moved out of solitary confinement and into the general population at the jail on April 22, 2024, more than ten months after first being placed in solitary confinement (and just five days after this lawsuit was filed). Ex. C at 220. While Plaintiff's conditions have improved with removal from solitary confinement, they are still injurious to his mental health, and every day spent in jail is one more day where his mental illness is going untreated.

## LEGAL ARGUMENT

### I.    LEGAL STANDARD.

In determining whether to grant a preliminary injunction, the Court must analyze the following factors: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that the temporary restraining order will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Here, all four of the *Dataphase* factors weigh in favor of granting the injunction.

### II.   PLAINTIFF IS SUFFERING IRREPARABLE HARM AND WILL CONTINUE TO SUFFER HARM UNTIL HE RECEIVES APPROPRIATE HOUSING AND TREATMENT.

To demonstrate irreparable harm, a party must show that the harm is certain and great and is of such imminence that there is a clear and present need for equitable relief.

*Novus Franchising Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

The ongoing violation of Plaintiff's constitutional rights constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Especially where, as here, Plaintiff has shown a likelihood of success on the merits. *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2nd Cir. 2021). (explaining that "in cases alleging constitutional harm," demonstrating a likelihood of success, "ordinarily warrants a finding of irreparable harm").

Moreover, Plaintiff is being harmed by his ongoing detention at the ADC despite his obvious and diagnosed mental illness and serious medical needs. As one federal judge put plainly:

> Our jails are not suitable places for the mentally ill to be warehoused while they wait for services. Jails are not hospitals, they are not designed as therapeutic environments, and they are not equipped to manage mental illness or keep those with mental illness from being victimized by the general population of inmates. Punitive settings and isolation for twenty-three hours each day exacerbate mental illness and increase the likelihood that the individual will never recover.

*Trueblood v. Washington State Dep't of Soc. & Health Servs.,* No. C14-1178 MJP, 2017 WL 4700326, at *1 (W.D. Wash. Oct. 19, 2017); *see also Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121–22 (9th Cir. 2003) ("County jails are simply unable to provide restorative treatment, and the jails' disciplinary systems may exacerbate the defendants' mental illnesses."); *Lynch v. Baxley*, 744 F.2d 1452, 1461 (11th Cir. 1984) ("Temporary confinement in jail is particularly harmful to those who are mentally ill. Those detained in

jail are surrounded by accused criminals and jailers rather than professionals trained to deal with mental problems.").

While Plaintiff was removed from solitary confinement several days after his lawsuit was filed, his illness nonetheless continues to go untreated except by medication, and he remains confined at a facility unequipped to manage his illness. Plaintiff is being harmed, both physically and constitutionally, by his ongoing confinement at the ADC. As the expert affidavit attached to Plaintiff's Complaint makes clear, the contra-therapeutic setting of the jail can cause already fragile mentally ill individuals to decompensate and result in other harms. ECF No. 2-1 at 4.

Since Plaintiff was committed in January, he has been denied time out of his cell due to "behavior" issues that are a direct result of his untreated illness, been denied access to jail commissary, received no treatment or care other than being offered medication, and been allowed to experience untreated florid psychosis which may have caused permanent psychological injury. *See* Ex. C at 213-215. Moreover, pursuant to the statutory scheme under which he was committed, Plaintiff cannot be discharged from DHS custody – and released from confinement – until he makes such progress in regaining his mental health that a panel of mental health professionals determines he may be released from custody. *See* Minn. Stat. 253B.18, subd. 7. Every day that goes by with Plaintiff sitting in jail is yet one more day in which he is not progressing toward the goal of release from DHS custody. In short, Plaintiff's ongoing detention at the ADC has harmed and continues to harm him, and this factor weighs strongly in favor of granting the injunction.

## III. PLAINTIFF HAS A FAIR CHANCE OF PREVAILING ON THE MERITS.

Plaintiff challenges DHS' ongoing confinement of him at the ADC and refusal to admit him into the Minnesota Security Hospital (now known at the Forensic Mental Health Program, or "FMHP"). Because Plaintiff's claims do not challenge the implementation of a duly enacted statute, but rather the agency's failure to meet its constitutional obligations as the entity entrusted to keep him "safe and secure," he demonstrates a likelihood of success if he shows a "fair chance of prevailing." A "fair chance of prevailing" is "something less than fifty percent." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008) ("[C]ourts should . . . apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes.").

Plaintiff has a fair chance of prevailing – indeed, he is likely to prevail – on his claims that housing him at the jail despite his obvious mental illness and need for medical care violated and continues to violate his due process rights. There are two sides to this due process coin.

First, the nature and duration of Plaintiff's confinement at the jail while in DHS custody violates due process. As discussed below, Plaintiff's conditions of pretrial confinement are and have been punitive, and they bear no reasonable relation to the purpose for which he has been detained and committed. Accordingly, they violate due process. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) )(holding, "due process requires that

the nature and duration of commitment [of an incompetent individual] bear some reasonable relation to the purpose for which the individual is committed").

Second, DHS' refusal to promptly transfer Plaintiff to a treatment facility, or otherwise provide Plaintiff with essential mental health treatment, violates Plaintiff's due process right to receive adequate medical care while detained and in DHS custody, and as discussed below he has more than a fair chance of prevailing on this claim. *See Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (holding that pretrial detainees have a right to medical care under the Due Process Clause of the Fourteenth Amendment).

A. **The Nature and Duration of Plaintiff's Confinement Violates Plaintiff's Due Process Rights.**

As the Supreme Court explained in *Jackson v. Indiana*: "At the least, due process requires that the nature and duration of commitment [of an incompetent individual] bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. 715, 738 (1972); *c.f. Powell v. Maryland Dep't of Health*, 168 A.3d 857, 874 (Md. Ct. App. 2017) ("Any delay in transferring that [mentally ill] defendant to a designated facility pursuant to a commitment order must be reasonable in relation to the purpose of treating the defendant while protecting both the defendant and the public.")(citing *Jackson*, 406 U.S. at 738).

Further, pretrial detainees – including the civilly committed – must not be subjected to punitive conditions of confinement. "In analyzing whether a condition of confinement is punitive, courts 'decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Karsjens*

*v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021) (quoting *Bell*, 441 U.S. at 538). Conditions of confinement are "punitive" if they are "not reasonably related to a legitimate governmental purpose or . . . excessive in relation to that purpose." *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020).

In *Lynch v. Baxley*, the Eleventh Circuit affirmed that lengthy detention of mentally ill individuals awaiting civil commitment violates due process because it is punitive and bears no rational relation to a legitimate governmental purpose. *Lynch v. Baxley*, 744 F.2d 1452, 1461 (11th Cir. 1984). The court explained:

> Jail is a place of incarceration for those accused of crimes. If pretrial detainees cannot be punished because they have not yet been convicted, then emergency detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment. Temporary jail detention of those awaiting civil commitment proceedings as is currently practiced in Alabama violates substantive due process.

*Id.* at 1457, 1461.

Similarly, the Ninth Circuit has held:

> Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals.

*Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (citing *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir.2000)). Numerous other courts have reached the same

conclusion: prolonged detention of mentally ill individuals violates their due process rights.[4]

Indeed, the impropriety of warehousing mentally ill individuals in jail, pending and after civil commitment proceedings, is not controversial. As detailed in Plaintiff's Complaint, over the past decade numerous state and county officials have conceded the

---

[4] *E.g., Disability L. Ctr. v. Utah*, 180 F. Supp. 3d 998, 1012 (D. Utah 2016) (holding plaintiffs had stated a plausible substantive due process claim where they had been civilly committed but detained at length in jail facilities due to lack of available beds at state hospital); *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 945 (E.D. Ark. 2002) (finding that plaintiffs' constitutional rights had been violated due to delays in admitting them to the Arkansas State Hospital after having been civilly committed); *United States v. Calderon-Chavez*, No. EP-22-CR-01664-DCG-1, 2023 WL 5345582, at *4 (W.D. Tex. Aug. 18, 2023) (holding "the nine-month pre-hospitalization delay that Defendant has endured [after being found incompetent] violates the Due Process Clause"); *Advoc. Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 621 (E.D. La. 2010) (holding plaintiffs stated substantive due process claim where state incarcerated mentally ill individuals for months in county jails while awaiting transfer to the state mental hospital); *Cooper v. Kliebert*, No. 15-751-SDD-RLB, 2016 WL 3892445, at *5 (M.D. La. July 18, 2016) (holding that plaintiffs' due process rights were violated where, "Defendants practices have caused Plaintiffs to be unlawfully incarcerated for longer than the reasonable period of time necessary to determine their competency and have delayed their access to restorative treatment"); *State v. Hand*, 429 P.3d 502, 503 (Wash. 2018), (holding that state hospital's 76-day delay in admitting mentally ill individual held at jail violated his substantive due process rights.); *Matthew P. by Fedora P. v. Neifeld*, 185 N.Y.S.3d 623, 638 (N.Y. Sup. Ct. 2023) (citing *Trueblood* at length and holding that plaintiff alleged a substantive due process violation where he was held in county jail for 31 days after being civilly committed); *Powell v. Maryland Dep't of Health*, 168 A.3d 857, 878 (Md. Ct. App. 2017) (holding that unreasonable delay in transferring committed individual from jail to psychiatric hospital would violate due process under state constitution); *In re Loveton*, 244 Cal. App. 4th 1025, 1047, 198 Cal. Rptr. 3d 514, 532 (Cal. Ct. App. 2016) (holding that 60-day deadline for admitting mentally ill and committed individuals from jail to treatment facility was the "outside limit on what is statutorily and constitutionally permissible").

13

inhumanity and unconstitutionality of continuing to house civilly committed Minnesotans in jail rather than in treatment facilities. *See* ECF No. 2 at ¶¶ 175-223.

State Defendants knew prior to the filing of this lawsuit – and certainly are on notice now – that jailing Plaintiff, a seriously mentally ill individual – created excessive risks to Plaintiff's mental and physical health due to both the nature and duration of his confinement at the jail. As mental health professionals, State Defendants should be aware of the negative health risks and outcomes associated with incarcerating mentally ill individuals described in the expert affidavit submitted filed as an exhibit to Plaintiff's Complaint. ECF No. 2-1. Notably, DHS long ago banned the use of solitary confinement in its facilities because of the awareness that such confinement is contra-therapeutic. *See, e.g.,* "Respect and Dignity Statement", Ex. G at 1 (setting forth DHS position that use of seclusion to punish mentally ill individuals, "is not only non-therapeutic, but the consequences of punishment are counter to therapeutic intervention and are unacceptable"). Yet Plaintiff has spent months in solitary confinement while a patient in DHS' custody and care.

Further, DHS' public statements reflect the agency's longstanding knowledge that mentally ill individuals suffer while waiting in jail for placement at DHS facilities:

- "I don't blame anyone for running out of patience with [DHS] and how we've managed this previously. People shouldn't be in jail waiting for treatment."[5]

---

[5] https://www.startribune.com/left-in-limbo-hundreds-of-minnesotans-with-mental-illness-languish-in-jail/222828641/

- "... citing recent waiting lists for DHS beds, [the DHS medical director] said the situation had 'reached a new level of chaos and crisis.'"[6]

- "I use the word 'crisis' ... I think we have a crisis in our whole mental health system, starting with those in jails. ... We don't have facilities available to move people to a therapeutic environment."[7]

Other public officials have emphasized to DHS the consequences of its failure to promptly transfer mentally ill individuals from jail into treatment facilities. In 2018, for example, the Minnesota Sheriff's Association wrote DHS a letter stating that the failure to promptly admit civilly committed individuals to DHS facilities was, "harmful to those in jail with severe mental illness."[8] In a similar letter sent in 2023, numerous county attorneys and sheriffs complained to DHS about the ongoing failure to promptly transfer mentally ill inmates, noting, among other things, that individuals with mental illness are too vulnerable to be kept in jail for long periods of time.[9]

Judges have also reinforced these points to DHS. In several state cases brought regarding failure to promptly transfer mentally ill individuals, Minnesota judges have taken DHS to task for those failures and pointed out the deleterious consequences on mentally ill inmates. For example, Minnesota District Judge Christian Wilton stated during a hearing involving DHS: "Each additional date of incarceration causes further deterioration of

[6] Ex. H at 41.
[7] https://www.startribune.com/legislative-auditor-urges-overhaul-of-mental-health-services-for-jail-inmates/370921631/
[8] https://www.startribune.com/as-mentally-ill-inmates-languish-in-minnesota-s-jails-sheriffs-demand-legal-action/475667303/
[9] https://kstp.com/5-investigates/county-attorneys-sheriffs-say-last-minute-change-will-gut-48-hour-law/

incompetent individuals with mental health [issues], increasing the risk of suicide and victimization by other inmates, causes illness to become more habitual and harder to cure, resulting in longer restoration periods or the inability to even restore persons to competency." Ex. I at. 41. Judge Colleen King put it more succinctly to DHS during a November 2022 hearing in a separate case: "There are countless . . . individuals who are languishing in jails because the issue [of prompt transfer] has not been addressed. Wrongful incarceration is not the United States of America." Ex. J at 36.

In short, DHS has been on notice for over a decade, at least, that housing mentally ill individuals in jail presents excessive risks to their mental and physical health, and that prompt transfer upon commitment is necessary to protect against those risks.

The State may respond that it simply cannot respect Plaintiff's constitutional rights because it lacks the resources to do so. "It has long-been established, however, that lack of funding does not excuse unconstitutional conditions of confinement." *C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 907 (S.D. Iowa 2020) (citing *Finney v. Ark. Bd. of Corr.*, 505 F.2d 194, 201 (8th Cir. 1974)).[10] If the State cannot confine an individual in

---

[10] *See also Williams v. Bennett*, 689 F.2d 1370, 1388 (11th Cir. 1982) (explaining that "when a court is considering injunctive relief against the operation of an unconstitutionally cruel and unusual prison system, it should issue the injunction without regard to legislative financing"); *Ohlinger v. Watson,* 652 F.2d 775, 779 (9th Cir. 1980) ("Lack of funds, staff or facilities cannot justify the State's failure to provide [mentally ill individuals] with [the] treatment necessary for rehabilitation."); *Terry ex rel. Terry*, 232 F. Supp. 2d at 945, ("Witnesses noted the difficulties in the system result from lack of funding from the State of Arkansas. However, 'limited resources cannot be considered an excuse for not maintaining the institution according to at least minimum constitutional standards.'") (quoting *Finney v. Mabry*, 534 F. Supp. 1026, 1041 (E.D. Ark. 1982)).

conformity with the Constitution, the answer is to transfer or release the individual to cure the constitutional violation. *E.g., Brown v. Plata,* 563 U.S. 493, 502, (2011) (holding that regardless of budgetary shortfalls, because "the medical and mental health care provided by California prisons has fallen short of minimum constitutional requirements . . . [a] court-mandated [prison] population limit is necessary to remedy the violation of prisoners' constitutional rights").

State Defendants' continued housing of Plaintiff at the ADC violates his due process rights because it is inherently punitive and bears no rational relation to a legitimate governmental purpose, and Plaintiff has shown a fair chance of prevailing on this claim.

### B. State Defendants Have Been Deliberately Indifferent To Plaintiff's Serious Medical Needs.

Pretrial detainees like Plaintiff have a due process right to adequate medical care. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976) ("The Eighth Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency, against which we must evaluate penal measures.") (internal quotation omitted). . To prove a violation of this right, a plaintiff must show the defendant's "deliberate indifference," to the plaintiff's serious medical needs. Specifically, a plaintiff must establish that the defendant knew about excessive risks to his health but disregarded those risks, and the unconstitutional actions (or failures to act) injured the plaintiff. *Karsjens v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021). "Whether an official was deliberately indifferent requires both an objective and a subjective analysis. *Id.* (citing *Scott v. Benson,* 742 F.3d 335, 339–40 (8th Cir.2014)).

"Under the objective prong, [a plaintiff] must establish that he suffered from an objectively serious medical need." *Id.* "To be objectively serious, a medical need must have been 'diagnosed by a physician as requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Id.* (quoting *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir.1997)). As discussed above, Plaintiff has been diagnosed with various forms of schizoaffective disorder, and his symptoms as chronicled in jail records and described in medical records clearly demonstrate his serious medical needs. *See, e.g.,* Ex. E at 120 ("In doing a chart review, history reveals Psychosis (unspecified) . . . Appointment will be scheduled for pt to be seen asap given his possible self-injury and history of severe mental health issues."); July 14, 2023 Rule 20 Evaluation, Ex. K at 5 (diagnosing Plaintiff with bipolar I disorder, moderate – severe, with psychotic features). Plaintiff has satisfied the "objective" prong of deliberate indifference.

Under the subjective prong, Plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). State Defendants were made aware of Plaintiff's serious medical needs when they received his commitment order on January 8, 2024, describing his diagnosis of serious mental illness and his need for treatment. Notably, DHS sent the state district court a letter on January 9, 2024, discussing the January 8, 2024 order and requesting relevant records that detail Plaintiff's mental illness and related symptoms. Ex. L.

Thus, State Defendants know and have known since at least January 8, 2024 that: (1) Plaintiff has been committed to DHS' custody and care, and DHS has been ordered "to hold [Plaintiff] safe and secure;" (2) Plaintiff has a serious mental illness; (3) Plaintiff has been languishing in solitary confinement at the ADC; and (4) Plaintiff has received no mental health treatment beyond being offered anti-psychotic medications. State Defendants, presented with this set of facts five months ago, have done nothing. That is the very definition of deliberate indifference, and Plaintiff has shown a fair chance – indeed a likelihood – of prevailing on this claim.

## IV. THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR GRANTING RELIEF.

"It is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). Moreover, the public has an interest in government acting in good faith and complying with the law. *United States v. Jacobo-Zavala*, 241 F.3d 1009, 1013 (8th Cir. 2001).

More specific to this case, the public has an interest in ensuring that mentally ill individuals are not subjected to unconstitutional conditions of confinement or denied treatment. *See, e.g.*, *C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 923 (S.D. Iowa 2020) (holding public interest existed in ensuring mentally ill juveniles not subjected to unconstitutional confinement or denied treatment); *Melendez v. Inch*, No. 320CV01023BJDJBT, 2021 WL 8084628, at *9 (M.D. Fla. Oct. 15, 2021) (finding that "it is in the public interest to ensure prisoners with mental illness are humanely treated in

accordance with Constitutional dictates"); *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996) ("The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance.") Thus, the public interest favors issuing the injunction.

Finally, the balance of harms weighs in favor of granting relief. As discussed above, Plaintiff is suffering and will continue to suffer numerous injuries and harms from being detained at the jail while awaiting placement at the FMHP or some other DHS program. DHS suffers from no burden by complying with the Constitution here, other than the administrative burden of admitting Plaintiff into an appropriate facility. *E.g., C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 922 (S.D. Iowa 2020) (sizable burden on mentally ill individuals of unconstitutional conditions of confinement outweighed administrative and financial burden required to bring facility into compliance).

## **CONCLUSION**

Plaintiff has demonstrated ongoing irreparable harm and has shown a fair chance of prevailing – indeed a likelihood of prevailing – on the merits, and the balance of harms and the public interest weigh in favor of granting his Motion. Accordingly, Plaintiff respectfully requests that the Court grant his Motion for Preliminary Injunction and order that the State Defendants admit him to the Forensic Mental Health Program in St. Peter within 72-hours of the issuance of the injunction.

Dated: May 7, 2024

s/ *Kevin C. Riach*

Kevin C. Riach
Attorney ID No. 389277
The Law Office of Kevin C. Riach
125 Main St. SE, Suite 339
Minneapolis, MN 55414
Phone: 612-203-8555

**ATTORNEY FOR PLAINTIFF**