| | |
|---|---|
| John Doe, | Case No. 24-cv-01392-NEB-DTS |
| Plaintiff, | |
| | **<u>REDACTED</u>** |
| vs. | |
| | **DHS DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| Hennepin County; Hennepin Healthcare System, Inc.; Laura Sloan, M.D., in her individual capacity; Minnesota Department of Health Commissioner Jodi Harpstead, in her official capacity; KyleeAnn Stevens, M.D., in her individual capacity; and Jane Doe 1, in her individual capacity, | |
| Defendants. | |

## INTRODUCTION

Like Plaintiff, the Commissioner is concerned there is not a medically appropriate bed available for Plaintiff at the Forensic Mental Health Program ("FMHP") in St. Peter. In fact, she wishes she could provide an immediate bed for every Minnesotan committed to DHS's care who needs one. The unfortunate reality, however, is that DHS simply does not have the capacity to do so, nor has the Legislature appropriated sufficient resources to DHS to make this happen. And although Plaintiff's situation is not ideal, DHS is making every effort to admit patients as quickly as possible. Indeed, a recent report from a Legislatively created task force charged with reviewing and evaluating this issue found that DHS's lack of capacity exists "despite the extensive and successful efforts by [DHS] to

streamline processes, efficiently utilize existing resources, and expand transition options."
ECF No. 18-1 at 27.

Given that Minnesota does not have an infinite number of mental health beds available, Minnesota law requires the Commissioner to prioritize admissions of individuals coming from jail and admit a person like Plaintiff within forty-eight hours of DHS determining a medically appropriate bed is available—a time period that Plaintiff does not claim has expired in this case. Nevertheless, in an attempt to end-run this statute, Plaintiff comes to this Court and asks for extraordinary relief in the form of an order that: (1) requires DHS to act inconsistent with this duly enacted state law, and (2) moves his admission ahead of many other individuals who have been waiting longer than Plaintiff for a medically appropriate bed. The motion should be denied.

## FACTUAL BACKGROUND

To put Plaintiff's motion in its proper context, it is important to set forth the underlying statutory provisions, as well as the interplay between findings of incompetency in criminal proceedings and subsequent, but separate, civil commitment proceedings.

## I. STATUTORY UNDERPINNINGS.

The issues Plaintiff raises in this lawsuit all stem from his civil commitment following a finding that he is incompetent to stand trial in a criminal proceeding.

### A.    The Criminal Proceeding.

In Minnesota, once the criminal court[1] determines that reason exists to doubt the defendant's competency, "the [criminal] court must suspend the criminal proceedings." Minn. R. Crim. P. 20.01, subd. 3.   If the defendant is charged with a felony or gross misdemeanor, the criminal court must order an examination of the defendant's mental condition and set a hearing on the defendant's competency. *Id.*, subd. 3(b).  If, following this examination, the criminal court cannot conclude, by the greater weight of the evidence, that the defendant is competent, it must enter an order finding the defendant incompetent. *Id.*, subd. 5(c).  If the defendant is not competent, and the charge is a felony or gross misdemeanor, the proceedings remain suspended, and the criminal court must order the county where the criminal case was filed to determine whether the defendant should be civilly committed. *Id.*  Although the criminal proceeding is suspended, the criminal court retains authority over the case, including but not limited to bail and conditions of release. *Id.*, subd. 3(c).

### B.    The Civil Commitment Proceeding.

The civil commitment process is conducted separately from the criminal proceeding.  Before the county can petition for civil commitment, it must first appoint a screening team to investigate whether a petition for civil commitment is appropriate.  Minn. Stat. § 253B.07, subd. 1(a).  If civil commitment is warranted, the county files a petition

---

[1] Because the criminal proceeding is separate from the civil commitment proceeding, DHS Defendants refer to the district court in the criminal matter as the "criminal court" and the district court in the civil commitment matter as the "commitment court."

for commitment in the commitment court. *Id.*, subd. 2(a). Generally, individuals who are civilly committed following a finding of incompetency fall into one of three commitment categories: (1) a person who poses a risk of harm due to a mental illness ("MI"), (2) a chemically dependent person ("CD"), or (3) a person who has a mental illness and is dangerous to the public ("MI&D").[2] *See* Minn. Stat. § 253B.02, subds. 2, 17, 17a. Notably, Minnesota does not civilly commit individuals specifically for competency restoration.[3] *See generally* Minn. Stat. ch. 253B.

A person against whom a civil commitment petition is filed has a right to counsel. Minn. Stat. § 253B.07, subd. 2c. A commitment hearing must be held within fourteen days of the petition, though that period can be extended for up to thirty additional days. Minn. Stat. § 253B.08, subd. 1(a). If the commitment court determines by clear and convincing evidence that the proposed patient meets criteria for commitment as MI&D, the commitment court must commit the person to a secure treatment facility (or to a treatment facility or state-operated treatment program willing to accept the patient). Minn. Stat. § 253B.18, subd. 1(a). A "secure treatment facility" means the Minnesota Security Hospital, which now does business as the Forensic Mental Health Program ("FMHP"). Minn. Stat. § 253B.02, subd. 18a. Within 90 days of the initial commitment or admission (or as otherwise agreed to by the parties), the commitment court must hold a final

---

[2] As Plaintiff was civilly committed as MI&D, this brief focuses primarily on that specific type of commitment.
[3] Because Minnesota does not civilly commit individuals for competency restoration, there are instances where a person is found incompetent to stand trial but does not meet the criteria for civil commitment.

determination hearing.[4]  Minn. Stat. § 253B.18, subd. 2(a).  If the commitment court finds the person continues to be a person who is MI&D, it must order that the person be committed for an indeterminate period of time.  *Id.*, subd. 3.  Once indeterminately committed, a person must go through the statutory reduction in custody process to be transferred to a non-secure facility, provisionally discharged, or discharged.  *Id.*, subds. 4c(a), 5.

C.  **The Priority Admission Statute.**

Minnesota law requires the Commissioner to prioritize the admission of certain individuals who are ordered to be confined in, or civilly committed to, a state-operated treatment program, and who are residing in a jail or correctional institution.  Minn. Stat. § 253B.10, subd. 1(b).  Under this "priority admission" statute, these individuals must be admitted to a state-operated treatment program within forty-eight hours from the time DHS determines a medically appropriate bed is available.  *Id.*, subd. 1(e).

II.  **PLAINTIFF'S CRIMINAL CHARGES, CIVIL COMMITMENT, AND PLACEMENT ON DHS'S PRIORITY ADMISSION WAITLIST.**

A.  **Plaintiff's Criminal Charges and Incompetency Finding.**

On June 14, 2023, a criminal complaint was filed against Plaintiff, charging him with one count of second-degree assault with a dangerous weapon that caused substantial bodily harm, a felony.  Complaint & Order of Detention, *State v. Doe*,

---

[4] The commitment court, with agreement of the county attorney and the patient's attorney, may waive the review hearing and immediately order an indeterminate commitment, or continue the review hearing for up to one year.  Minn. Stat. § 253B.18, subd. 2(b).

███████████████████ (Minn. Dist. Ct. June 14, 2023) (attached as Boese Decl. Ex. 1).[5]

The complaint alleged that on June 12, 2023, Plaintiff stabbed his father in the back six times with a six-inch kitchen knife. *Id.* at 2. Plaintiff was taken into custody at the Hennepin County Adult Detention Center ("ADC") the day of the incident, and during his arraignment on June 15, 2023, the district court set bail at $50,000 with no conditions or $25,000 with conditions. Conditional Release Order, *Doe Criminal Case* (June 15, 2023) (Boese Decl. Ex. 2). The court also ordered Plaintiff to undergo a psychological evaluation pursuant to Minnesota Rule of Criminal Procedure 20.01 to determine Plaintiff's competency to proceed in the criminal trial. Order to Fourth Judicial Dist. Ct. Psych. Servs., *Doe Criminal Case* (June 15, 2023) (Boese Decl. Ex. 3). The court appointed examiner supported a diagnosis of, among other things, bipolar I disorder, moderate – severe, with psychotic features. ECF No. 19-4 at 6. The examiner ultimately concluded that Plaintiff was incompetent to proceed to trial. ECF No. 19-4 at 8–9.

Plaintiff was to appear at a competency hearing on July 18, 2023, but ADC records indicate that he refused to go to court. ECF No. 19-2 at 142. The hearing was rescheduled for July 25, 2023, and in an order issued the following day, the court found that Plaintiff was incompetent to stand trial, suspended the criminal proceedings, and ordered the Hennepin County Prepetition Screening Program to conduct a prepetition screening and

---

[5] Given the Court's order permitting Plaintiff to proceed under a pseudonym, future citations to this criminal case will omit the case number and simply refer to the docket as "*Doe Criminal Case*." DHS Defendants have also, out of an abundance of caution, filed the entirety of these court filings under temporary seal given Plaintiff's pseudonym, even though they are publicly available. DHS Defendants will meet and confer with Plaintiff regarding continued sealing of these documents, as contemplated by L.R. 5.6.

issue a recommendation as to whether Plaintiff should be civilly committed.  Findings of Fact, Conclusions of Law & Order Regarding Competency 2–5, *Doe Criminal Case* (July 26, 2023) (Boese Decl. Ex. 4).  The order specified that if Plaintiff is committed, the "Hennepin County Sheriff shall transport the Defendant from the Hennepin County Adult Detention Center to the custody of the head of the facility named in the order for civil commitment *when notified that placement is available for the Defendant*."  *Id.* at 3 (emphasis added).

### B.    Plaintiff's Initial Commitment As MI&D.

In a separate proceeding, on August 7, 2023, the Hennepin County Attorney's Office petitioned to civilly commit Plaintiff as MI&D.  Petition for Judicial Commitment, *In the Matter of the Civil Commitment of [John Doe]*, No. ███████████ (Minn. Dist. Ct. Aug. 7, 2023) (Boese Decl. Ex. 5).[6]  Eight days later, Plaintiff was transferred from ADC to HCMC for a psychiatric evaluation.  ECF No. 19-3 at 92.  On August 18, 2023, the district court ordered HCMC to "hold [Plaintiff] for observation, evaluation, diagnosis, care, treatment, and, if necessary, confinement."  Am. Notice and Ord. for Custody, Examination, and Hearing 1, *Doe Commitment Case* (Aug. 18, 2023) (Boese Decl. Ex. 6).  Although the commitment court extended this hold on August 22, Ord. for Continuance & Extension of Current Hold, *Doe Commitment Case* (Aug. 22, 2023) (Boese Decl. Ex. 7), Plaintiff was discharged back to ADC that same day.  ECF No. 19-3 at 37.  Medical records

---

[6] Similar to Plaintiff's criminal case, future citations to this civil commitment case will omit the case number and simply refer to the docket as "*Doe Commitment Case*."  These documents are also filed under temporary seal.

state that Plaintiff reported that he "feels he is ready to go back to jail," ECF No. 19-3 at 38, and a health services nurse at ADC noted that Plaintiff "appears much improved compared to time of transfer [to HCMC]." ECF No. 19-3 at 36.

A hearing on the petition for commitment as MI&D was scheduled for September 19, 2023; however, on September 15, 2023, the parties informed the court that they had agreed to a continuance due to a delay in receiving the examiner's report, and the court continued the hearing to October 2, 2023. Ord. Sch. Trial, *Doe Commitment Case* (Sept. 20, 2023) (Boese Decl. Ex. 8). On September 18, 2023, Plaintiff waived his right to a hearing on the petition. *See* Minn. Stat. § 253B.08, subd. 1; Waiver, *Doe Commitment Case* (Sept. 18, 2023) (Boese Decl. Ex. 9). The examiner submitted a report on September 29, 2023, and the parties agreed to another continuance to October 20, 2023. Second Ord. Sch. Trial, *Doe Commitment Case* (Oct. 2, 2023) (Boese Decl. Ex. 10). On October 10, 2023, Plaintiff's counsel filed a notice informing the court that Plaintiff would be examined by his retained experts on November 2 and November 16. Notice of Taking Examinations, *Doe Commitment Case* (Oct. 10, 2023) (Boese Decl. Ex. 11). With the agreement of the parties, the court continued the hearing a third time to December 5, 2023.

Plaintiff's commitment trial began on December 7, 2023, and was continued to December 22, 2023, because "[t]he trial time was insufficient to conclude the proceeding." Ord. Continuing Trial, *Doe Commitment Case* (Dec. 7, 2023) (Boese Decl. Ex. 12). The trial concluded on December 22, at which time the parties agreed that written closings would be submitted on December 29; Plaintiff's counsel, however, requested an extension

to January 2, 2024, which was subsequently granted. Motion for Extension, *Doe Commitment Case* (Dec. 28, 2023).

On January 8, 2024, the district court ordered Plaintiff's MI&D commitment. ECF No. 19. The court committed Plaintiff to the head of FMHP, ordered the head of FMHP to report to the criminal division of the district court when Plaintiff regains competence, and instructed that the head of FMHP "shall not permit [Plaintiff's] release, institutional transfer, partial institutionalization status, termination, discharge, or provisional discharge of the civil commitment until further Order of the Hennepin County District Court – Criminal Division." ECF No. 19 at 13.

### C. No Medically Appropriate Bed Is Available For Plaintiff.

Although Plaintiff was civilly committed to FMHP, ████████████████████ ████████████████████████████████████████████████. Declaration of Dr. KyleeAnn Stevens, ¶ 28. As discussed in detail below, FMHP is currently at capacity. ████████████████████████████████████████████████ *Id.* ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ *Id.* ████████████████████████████ ██████████████████████ *Id.*, ¶¶ 28–29.

### D. Plaintiff's Indeterminate Commitment as MI&D.

On March 7, 2024, Dr. Jennifer L. Harrison filed a 60-day treatment report to the commitment court, wherein she concluded that Plaintiff remained in need of civil commitment. ECF No. 19-1 at 33. The parties agreed to schedule a hearing on Plaintiff's

indeterminate commitment for May 1, 2024. Opp'n Mem. 1, *Doe Commitment Case* (Apr. 25, 2024) (Boese Decl. Ex. 14).

On April 24, 2024, Plaintiff's counsel moved to continue the May 1 hearing "until 60 days after [Plaintiff] has been actually admitted to a DHS treatment facility." Motion to Continue Hearing 2–3, *Doe Commitment Case* (Apr. 24, 2023) (Boese Decl. Ex. 15). The court denied the motion, and on May 3, 2024, ordered Plaintiff be indeterminately committed as a person who is mentally ill and dangerous to the public. Ord. for Indeterminate Commitment 4, *Doe Commitment Case* (May 3, 2024) (Boese Decl. Ex. 16).

### E. Plaintiff Is Currently Receiving Mental Health Treatment In Jail.

At the time of the initial commitment order, Plaintiff had been residing at ADC continuously since he left HCMC in August 2023. HCMC and ADC records note that Plaintiff's mental health was relatively stable for several months, and an ADC record from February 6, 2024, notes that jail staff "have suggested possible Gen Pop in the past, but inmate declined offer." ECF No. 19-2 at 224–25. However, Plaintiff abruptly stopped taking his prescribed medication in mid-February, which worsened his psychotic symptoms. ECF No. 19-2 at 224. On February 23, 2024, Plaintiff's treatment team filed a *Jarvis* petition.[7] *See* Sch. Ord. 1, *Doe Commitment Case* (Mar. 8, 2024) (Boese Decl. Ex. 17). A hearing on the petition was set for March 8, 2024, but Plaintiff agreed to

---

[7] A petition to authorize the involuntary administration of neuroleptic medication under the Minnesota Commitment and Treatment Act is known as a *Jarvis* petition. Minnesota law requires court approval before a treatment team can administer neuroleptic medication to a non-consenting, not competent individual. Minn. Stat. § 253B.092; *Jarvis v. Levine*, 418 N.W.2d 139 (Minn. 1988).

continue the hearing for two weeks "so that [Plaintiff's] medical provider has the opportunity to appear and participate in the hearing." *Id.* On March 25, 2024, following the March 22 *Jarvis* hearing, the court issued an order authorizing the use of neuroleptic medication. Ord. Auth. Use of Neuroleptic Medication, *Doe Commitment Case* (Mar. 25, 2024) (Boese Decl. Ex. 18).

During a phone call with the Court on May 13, 2024, counsel for Hennepin County indicated that Plaintiff had been moved to the mental health unit at the Hennepin County Jail. Declaration of Brandon Boese, ¶ 2. Both counsel for Plaintiff and counsel for Hennepin County stated Plaintiff was medication compliant and was doing quite well.[8] *Id.*

## III. FMHP IS AT CAPACITY.

The pace of commitments to FMHP currently outpaces the number of medically appropriate beds FMHP has for patients who are civilly committed as MI&D. *See* Stevens Decl. ¶ 29 (stating FMHP is operating at capacity). Accordingly, FMHP operates a waiting list for available beds at the facility, categorizing individuals who qualify for priority admission under Minnesota Statutes section 253B.10, subd. 1, and those who do not. *Id.*, ¶ 11.

---

[8] DHS Defendants attempted to obtain recent medical records to substantiate this information, but Hennepin County indicated that the county was not sure it could share records with counsel for DHS without a protective order. Boese Decl. ¶ 3, Ex. 19. Hennepin County asked DHS Defendants to rely on the representations made by its counsel to the Court. *Id.*

## A. Factors That Affect FMHP's Capacity.

Like any hospital or treatment facility, treatment capacity at FMHP is dependent on numerous factors and requirements, and it must comply with the licensing requirements by the Minnesota Department of Health and the Minnesota Department of Human Services. Stevens Decl., ¶ 16. Nearly all of the patients served at FMHP are individuals civilly committed as MI&D. *Id.*, ¶ 4. These patients have highly complex medical and psychiatric conditions and may exhibit volatile or violent behaviors. *Id.* High acuity patients (i.e., those who are experiencing severe or volatile symptoms of their mental illness) need more physical space, separation from other patients, privacy, and a higher staff-to-patient ratio—all of these needs can impact and reduce FMHP's treatment capacity. *Id.*, ¶ 17. Accordingly, treatment capacity at FMHP can vary depending on the acuity of the current patients as well as the anticipated needs of referred individuals. *Id.*, ¶ 16.

Other factors can also impact FMHP capacity, such as delays in the discharge process for current patients, a lack of community placement options, and staffing shortages. *Id.*, ¶ 18. Notably, FMHP cannot admit new patients—even those who qualify for priority admission—until it can safely move patients to lower levels of care within the program or discharge patients who no longer require the level of care that FMHP provides. *Id.*, ¶ 19. Patients committed as MI&D, however, must go through the aforementioned reduction-in-custody process before they can be transferred to a non-secure unit, provisionally discharged from FMHP, or fully discharged from their commitment. *Id.*; *see also* Minn. Stat. §§ 253B.18, subd. 5, 253B.19, subds. 2, 3. This process can take many months, or even years to complete. Stevens Decl., ¶ 19.

But even if patients are granted provisional discharge through this statutory process, FMHP cannot release them until an appropriate community placement has been identified that has an available bed. *Id.*, ¶ 20; Minn. Stat. § 253B.18, subd. 8 (stating that a provisional discharge plan must be developed, implemented, and monitored by the county). As such, county case managers are crucial to the provisional-discharge planning process, and generally, this planning cannot go forward if the county does not actively participate, agree to the community placement, or agree to fund the community placement. Stevens Decl., ¶ 20.

Discharge delays result from myriad reasons, but typically the most common cause for a discharge delay is the lack of community placement for the person. *Id.*, ¶ 21. Most of the patients at FMHP have intensive psychosocial needs and criminal justice history, and some have predatory offender designations. *Id.* This means that the majority of patients need to be provisionally discharged from FMHP to a structured setting that has increased supervision and monitoring. *Id.* It would be rare for an individual to be provisionally discharged from FMHP directly to an independent living setting. *Id.* Minnesota, however, is experiencing a notable shortage of community-based care providers, such as group homes, adult foster care homes, and Intensive Residential Treatment Services programs. *Id.* And some of the existing and available providers are not willing to accept individuals who are committed as MI&D or who have predatory offender designations, making the

pool of options even smaller. *Id.* This further constricts community-based placement options.[9] *Id.*

Treatment capacity is not just measured in the number of physical beds at a facility. *Id.*, ¶ 24. A health care program also must have the right number and mix of trained and skilled staff. *Id.* To wit, FMHP's licensing variance with DHS requires FMHP to operate at a capacity where patients have sufficient access to a psychiatric practitioner or mental health professional such that FMHP can respond promptly and appropriately to emergent needs of patients. *Id.*, ¶ 25. It further requires that FMHP have sufficient staff to safely supervise and direct the activities of patients, taking into account the patients' level of behavioral and psychiatric stability, treatment needs, cultural needs, and vulnerabilities. *Id.* FMHP has experienced significant staffing shortages over the past three years, and like many health care systems in Minnesota and nationwide, FMHP has struggled to recruit and retain personnel, especially highly skilled nurses and many other direct care staff who care for, assist, and monitor FMHP's unique patient population. *Id.*, ¶ 24. This can also impact FMHP capacity. *Id.* Indeed, despite efforts to recruit and retain staff, the vacancy rate for nursing across FMHP is 23% (and 26% within the secure treatment units), and the vacancy

---

[9] It is important to note that provisional discharges from FMHP do not directly translate into open beds that can accommodate new admissions. Stevens Decl, ¶ 23. Most provisional discharges from FMHP involve individuals who reside on a non-secure unit within the program. *Id.* A new MI&D admission to FMHP cannot reside on a non-secure unit without going through the reduction in custody process. *Id.* Bed turnover on units that accommodate new admissions within FMHP does not happen until a patient residing on one of those units demonstrates a level of safety and stability that allows them to move to a lower level of care after going through the reduction in custody process (if committed as MI&D). *Id.*

rate for direct care staff across the program is 19% (and 21% within the secure treatment units).  Declaration of Lynn Glancey, ¶¶ 14–16.

## B.    FMHP's Admission Procedure.

For every patient referred to FMHP, the Department's Direct Care and Treatment ("DCT") division follows the same admissions process.  Stevens Decl., ¶ 8.  DCT reviews and evaluates admissions referrals through its highly trained Central Preadmissions ("CPA") staff.  *Id.*, ¶ 9.  When CPA staff receive a court order civilly committing an individual to FMHP, they first determine whether the person qualifies for priority admission.[10]  *Id.*, ¶ 11.  If they do, they are placed on the priority admission section of FMHP's waitlist.  *Id.*  If they do not, they are placed on the nonpriority admission section.  *Id.*  The priority admission section of the waitlist is ordered by the date that CPA confirms through documentation that the referral qualifies for priority admission.  *Id.*, ¶ 12.

CPA staff also gather information from the place where the person is located.  If the person is in jail, this may include jail logs, incident reports, jail medical information, and a verbal report from jail staff.  *Id.*, ¶ 10.  If available and known to DCT at the time of referral, CPA staff may also contact other community health care providers or facilities that have served the individual in the recent past to request records.  *Id.*

Dr. Joshua Griffiths, FMHP's Director of Psychiatry, Forensic Services, is delegated responsibility to review referrals for admission to FMHP and determine who is

---

[10] The Commissioner is not a party to civil commitment proceedings, and therefore the only way DHS finds out about a civil commitment order is if DHS is sent the commitment order.  Stevens Decl. ¶ 10.

appropriate for placement based on available beds, staffing, and individual patient's clinical needs. *Id.*, ¶ 6. He can only admit a patient to FMHP if it is capable of safely serving that patient and others. *Id.* Admitting more patients than can be safely served given patient acuity, milieu acuity, anticipated patient needs, physical plant limitations, staffing limitations, and regulatory requirements puts patients (both existing and new) and staff at significant risk. *Id.* It also could lead to regulatory citations from its licensing entities. *Id.* Admitting too many patients could also jeopardize the licensure of FMHP physicians and other licensed staff and place them, as well as other FMHP direct care staff, at risk of being subject to findings of maltreatment or neglect of patients, potentially rendering them ineligible to provide direct care. *Id.*

When a bed at FMHP is forecast to be open on an admission unit, Dr. Griffiths typically requests referral information for the top three to five individuals on the FMHP priority admission waitlist. *Id.*, ¶ 11. He will then evaluate each individual's treatment needs to determine whether they are appropriate for the anticipated bed opening. *Id.* Factors such as whether the individual requires a single-gender milieu due to individual patterns of sexually problematic behaviors, the individual's identified gender identity, reduced opportunities for interaction with peers, increased supervision needs, and the present patient mix on a particular unit are considered. *Id.* Most of the time, the forecasted bed is deemed medically appropriate for the individual at the top of the waitlist. *Id.*

DCT generally admits patients in the order they appear on the waitlist. *Id.*, ¶ 12. An individual may, however, be admitted "out of order" if, for instance, the available bed is not appropriate for the individuals closer to the top of the waitlist. *Id.* For example, if

the only bed that is available is on an all-female unit, and the first four individuals on the waitlist are men, the female patient who is fifth on the waitlist would be admitted ahead of the others.[11]  *Id.*

CPA staff offer to connect jails with mental health providers in DCT for purposes of clinical support while admissions are pending on the waitlist.  *Id.*, ¶ 13.  The staff in that office are available 24 hours a day, seven days a week and can provide a bridge to DCT providers for consultation and advice.  *Id.*

### C.    FMHP Operates At Capacity.

As of May 28, 2024, all the available beds at FMHP were filled with patients or scheduled for new patient admission.  Stevens Decl., ¶ 29.  All medically appropriate beds available for priority admissions are therefore currently full or otherwise scheduled to take admissions that predate Plaintiff's commitment order.[12]  *Id.*

---

[11] Another limited exception is made if a person is dually committed to both the Department of Corrections (under a criminal sentence) and DHS (under a civil commitment order), residing in prison, and the individual's prison sentence is set to expire.  *Id.*, ¶ 12.  DHS has historically prioritized the admission of these individuals due to their expiring prison sentences, even if they are not on the priority admission waitlist.  *Id.*  FMHP also had to make one emergency admission of a person from HCMC due to this person's extremely high acuity.  *Id.*  The Legislature recently amended the priority admission statute to permit DHS to add up to ten patients from hospital settings to the priority admission waiting list. Act of May 19, 2024, ch. 125, art. 4, § 11, 2024 Minn. Laws ("The commissioner of human services must immediately approve an exception to add up to ten patients who have been civilly committed and are in hospital settings to the waiting list for admission to medically appropriate direct care and treatment beds under Minnesota Statutes, section 253B.10, subdivision 1, paragraph (b).").  This amendment was effective May 25, 2024, the day after it was signed by the Governor.  *Id.*

[12] Because FMHP is a residential facility with tiered levels of care, it maintains a small number of beds to create a margin of safety for patients who need to transfer, on an emergent basis, to a unit that provides a higher level of care.  Stevens. Decl., ¶ 14. (Footnote Continued on Next Page.)

### D. DHS Does Not Have Funding To Significantly Increase Its Bed Capacity At FMHP.

DCT receives its funding for its hospitals through legislative appropriations. Glancey Decl., ¶ 2. DHS and DCT may only spend money that is appropriated for specific purposes and programs on those items. *Id.*, ¶ 5. DHS is not appropriated extra funding that one DCT program could redistribute to another without reducing its own capacity. *Id.*, ¶ 6.

During this most recent 2024 Legislative Session, FMHP was appropriated approximately $6.75 million to repurpose, staff, and operate another DHS facility in St. Peter to create additional capacity within FMHP. *Id.*, ¶ 20. The Legislature based this appropriation on a January 2025 start date to ensure there is enough time to transition existing patients at this facility. *Id.* The Legislature also additionally appropriated approximately $1 million to FMHP to use for employee incentives to retain and attract staff to work at the facility once it is repurposed. *Id.*

DHS is obligated to operate within the appropriation it receives from the Legislature, and it is required to have a balanced budget at the end of each biennium. *Id.*, ¶ 17. DHS does not have any other available funding that is not already earmarked for another purpose from the Legislature to construct new buildings or renovate existing

---

FMHP also needs to be able to accommodate voluntary returns and emergency revocations for individuals civilly committed as MI&D who are on provisional discharge in the community. *Id.* None of these scenarios can be predicted, which is why FMHP must keep these beds open. *Id.* Notably, there are currently 245 individuals committed as MI&D and on provisional discharge in a community setting. *Id.* In 2023, twenty-three individuals required emergency revocation back to FMHP. *Id.*

program buildings that are specifically intended to serve the patient population served by FMHP.[13]  *Id.*, ¶ 22.

## IV.  THE PRESENT MOTION.

Plaintiff now moves for preliminary injunctive relief, asking this Court to order the Commissioner and Dr. Stevens to immediately admit Plaintiff to FMHP.

## LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To determine whether to issue a preliminary injunction, "the district court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction will inflict on the other interested parties; (3) the probability the movant will succeed on the merits; and (4) whether the injunction is in the public interest." *Izabella HMC-MF, LLC v. Radisson Hotels Int'l*, 378 F. Supp. 3d 775, 777–78 (D. Minn. 2019) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).  The party seeking injunctive relief bears the burden of proving all the preliminary injunction factors. *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  A preliminary injunction is already an extraordinary remedy, but the burden is even higher when a party requests a mandatory preliminary injunction requiring the alteration of the status quo.  *See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993).

---

[13] DCT did receive an appropriation to design a replacement facility for an existing building on the campus of the Anoka Metro Regional Treatment Center, but at this time DHS cannot anticipate with certainty what patient population this building will serve once the design is complete.  Glancey Decl. ¶ 22.

A party seeking to enjoin enforcement of a duly enacted state statute also bears a heightened burden to demonstrate that they are "likely to prevail on the merits." *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (quoting *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008)) (en banc). This is more than the "fair chance" of success that is typically required for a preliminary injunction. *Id.* "The higher bar reflects the idea that governmental policies implemented through legislation and developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* at 455–56.

## ARGUMENT

Put simply, Plaintiff's motion should be denied because it is undisputed that Hennepin County, not DHS, controls his conditions of confinement, the unit on which he lives, and the medical care he receives while in jail. Tellingly, Plaintiff did not seek preliminary injunctive relief against Hennepin County to enjoin any of the alleged practices at the jail to which he objects.[14] Instead, Plaintiff asks this Court to order that DHS immediately admit Plaintiff to FMHP because he believes that *any* confinement in jail following his civil commitment is unconstitutional—a position that is unsupported by the law. But not only are his claims unlikely to succeed on the merits, Plaintiff failed to present evidence of irreparable harm. The Court should permit DHS to continue its work triaging new commitments, freeing up bed space as it becomes available, managing its waitlist, and complying with Minnesota law by admitting new patients within forty-eight hours of a

---

[14] To be clear, DHS is not arguing that Hennepin County failed to provide constitutionally required medical care.

medically appropriate bed being available. It should not permit Plaintiff to be admitted before others who have been waiting longer.

## I. PLAINTIFF CANNOT OBTAIN AN INJUNCTION AGAINST DR. STEVENS, IN HER INDIVIDUAL CAPACITY.

As an initial matter, Plaintiff's motion seeks an injunction against Dr. Stevens, in her individual capacity,[15] and should therefore be denied. All allegations Plaintiff makes against Dr. Stevens relate to her role as the Executive Medical Director for Behavioral Health at DHS. Any purported authority Dr. Stevens has related to Plaintiff and his admission to FMHP is only authority that she is given as a DHS employee. Courts have routinely denied injunctions against a defendant, in his or her individual capacity, when the alleged conduct sought to be enjoined is only related to action they can take in their capacity as a government employee. *See Hummel v. Minn. Dep't of Agric.*, 430 F. Supp. 3d 581, 593 (D. Minn. 2020) (holding that a plaintiff cannot obtain an injunction against government defendants, in their individual capacity, because the defendants "do not have authority in their *individual* capacities to grant [the relief sought]").[16] Plaintiff's request to enjoin Dr. Stevens, in her individual capacity, should be denied.

---

[15] Dr. Stevens is sued only in her individual capacity. *See* ECF No. 2, ¶ 9.

[16] Other courts agree. *See Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief."); *Ballard v. Reitz*, No. 4:23-cv-1050, 2024 WL 180857, at *2 (E.D. Mo. Jan. 17, 2024) (holding plaintiff was not entitled to an injunction against government official in his individual capacity); *Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd.*, 150 Fed. App'x 389, 401 (6th Cir. Sept. 14, 2005) ("Just as a plaintiff cannot sue a defendant in his official capacity for money damages, a plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to (Footnote Continued on Next Page.)

## II. THE *DATAPHASE* FACTORS WEIGH AGAINST GRANTING THE REQUESTED INJUNCTION.

As to the Commissioner, in her official capacity, Plaintiff's motion should be denied because he is not likely to succeed on the merits, he cannot meet his burden to show irreparable harm, and public policy weighs against enjoining DHS from carrying out a duly enacted Minnesota law and putting Plaintiff ahead of other patients.

### A. Plaintiff Is Not Likely To Succeed On The Merits.

Ordinarily, a party seeking an injunction can meet the "likelihood of success" *Dataphase* factor by showing only that they have a "fair chance of prevailing" on the merits. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). This fair-chance standard does not require the party seeking relief to "show 'a greater than fifty per cent likelihood that he will prevail on the merits.'" *Id.* at 731 (quotation omitted). But because Plaintiff seeks to enjoin enforcement of a duly enacted statute, he faces "the more rigorous standard" to show that, on balance, he "is likely to prevail on the merits." *Id.* at 732.

Plaintiff erroneously claims his lawsuit does not challenge the implementation of a duly enacted state law. But the effect of his claim—i.e., that DHS must admit him to a state-operated treatment facility before a medically appropriate bed is available—invalidates Minnesota Statute section 253B.10, subdivision 1(e), which instructs DHS to

---

the official's job, i.e., his official capacity."); *Jacobs v. Tanchek*, No. 2:09-cv-832, 2009 WL 10678774, at *2 (D. Nev. Sept. 23, 2009) ("[A]ny claim for injunctive relief against Defendant in his individual capacity to take official action as the Labor Commissioner cannot stand.").

admit a patient within forty-eight hours of the Executive Medical Director determining that a medically appropriate bed is available. As explained by the Eighth Circuit, if the injunction enjoins government action taken in accordance with a state law, the heightened standard must be met by the plaintiff:

> Where the moving party seeks to stay government action taken in the public interest to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.

*Rounds*, 530 F.3d at 731 (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).

Accordingly, the heightened standard applies to Plaintiff's motion. And as discussed below, Plaintiff cannot meet this standard on his deliberate indifference and punitive conditions claims.[17]

### 1. Plaintiff Is Not Likely To Succeed On His Deliberate Indifference Claim (Counts I, III, And VI).

Plaintiff is not likely to succeed on his claim that the Commissioner was deliberately indifferent to his medical needs because (1) he was not in the Commissioner's physical custody, and (2) at no point after Plaintiff's civil commitment was he suffering from such a severe medical need such that the deliberate indifference test applies.

---

[17] Plaintiff's motion is premised on his deliberate indifference claims (Counts I, III, and VI) and his punitive conditions claim (Count VII) only, as he does provide any argument regarding procedural due process (Count V) or unreasonable restraint (Count VIII). DHS Defendants accordingly do not address procedural due process or unreasonable restraint in their brief.

### a. Plaintiff Was Never In The Commissioner's Physical Custody, Which Is Fatal To His Claim.

There is no dispute that at all relevant times, Plaintiff was in the physical custody of Hennepin County. This is fatal to Plaintiff's deliberate indifference claim because without physical custody, the Commissioner does not owe Plaintiff any constitutional obligation to provide him with medical care. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (holding that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf," and that only when "the State takes a person into its custody and holds him there against his will" does "the Constitution impose[] upon it a corresponding duty to assume some responsibility for his safety and general well-being"); *Briggs v. Okla. ex rel. Okla. Dep't of Human Servs.*, 472 F. Supp. 2d 1304, 1313 (W.D. Okla. 2007) ("In the absence of *both* legal *and* physical custody, no special relationship exists, and thus, no attendant affirmative duty to protect exists." (emphasis added)).

Under Minnesota law, a person is not under the Commissioner's custody and control until he arrives at a state-operated treatment program. Minn. Stat. § 253B.10, subd. 1(c). Nor does Minnesota law give the Commissioner any authority to tell Hennepin County how to manage its jail, or how to respond to any health concerns of individuals detained in the jail; naturally, Minnesota vests this authority with the county sheriff. Minn. Stat. § 387.11 (stating that the county sheriff "shall have the charge and custody of the county jail and receive and safely keep therein all persons lawfully committed thereto").

Because Plaintiff has not been in the physical custody of the Commissioner at any time relevant to this lawsuit, he is not likely to succeed on this claim.

> **b.** **The Commissioner, In Her Official Capacity, Was Not Deliberately Indifferent To Any Serious Medical Need.**

Even if the Commissioner could theoretically be held liable on a deliberate indifference theory despite her lack of physical custody of Plaintiff, his claim is nevertheless unlikely to succeed on the merits because the record evidences an appropriate response by Hennepin County to Plaintiff's mental health symptoms in the weeks following the date of his civil commitment order.

There is no respondeat superior or vicarious liability in § 1983 claims. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978). For a governmental entity to be held liable under section 1983, the entity itself must be a "moving force" behind the deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Accordingly, the entity's "'policy or custom' must have played a part in the violation of federal law." *Id.*; *see also Burlison v. Springfield Pub. Sch.*, 708 F.3d 1034, 1041 (8th Cir. 2013) (plaintiff must show "'a constitutional violation was committed pursuant to an official 'policy or custom' and that such 'policy [or] custom' was the moving force behind plaintiff's injury.'"). A suit against the Commissioner, in her official capacity, is in effect a suit against the governmental entity. *See Graham*, 473 U.S. at 165.

Where "a [civilly committed] patient's Fourteenth Amendment claim is for constitutionally deficient medical care," courts "apply the deliberate indifference standard from the Eighth Amendment." *Mead v. Palmer*, 794 F.3d 932, 936 (8th Cir. 2015) (citing

*Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014); *Senty–Haugen v. Goodno*, 462 F.3d 876, 889–90 (8th Cir. 2006)). "To demonstrate the 'deliberate indifference' necessary to sufficiently plead an Eighth Amendment violation, a plaintiff must demonstrate (1) that he had an objectively severe medical need, and (2) that [the defendant] knew of, but deliberately disregarded that need." *Sorenson v. Minn. Dep't of Human Servs.*, No. 14-cv-4193, 2015 WL 251720, at *11 (D. Minn. Jan. 20, 2015) (holding MSOP client failed to state a claim upon which relief may be granted regarding alleged deliberate indifference of medical care). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" *Jones v. Minnesota Dep't of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008).

A plaintiff "must demonstrate 'more than negligence, more even than gross negligence.'" *Sorenson*, 2015 WL 251720, at *11 (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). The deliberate indifference standard "is a difficult standard to meet," as the disregard for a known, objectively serious medical need "must rise to the level of criminal recklessness." *Jones*, 512 F.3d at 481; *Sorenson*, 2015 WL 251720, at *11 ("Deliberate indifference is akin to criminal recklessness."). Failure to treat a medical condition does not constitute punishment under the Eighth Amendment unless the defendant knew that the plaintiff's medical condition "created an excessive risk" and then failed to act on that knowledge. *Id.* (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)); *see also Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (same). "As long as this threshold is not crossed, [civilly committed

persons] have no constitutional right to receive a particular or requested course of treatment, and . . . doctors remain free to exercise their independent medical judgment." *Sorenson*, 2015 WL 251720, at \*11 (quoting *Dulany*, 132 F.3d at 1239). Only those "involved in, or directly responsible for," providing medical care can be liable for failure to treat. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), as amended (Mar. 4, 2016) (citations omitted). Further, "[m]erely demonstrating that a [] doctor committed medical malpractice is insufficient to establish deliberate indifference." *Jackson v. Buckman*, 756 F.3d 1060, 1065–66 (8th Cir. 2014). Deliberate indifference requires more. *Id.*

Plaintiff has not demonstrated that DHS has a policy or custom of deliberate indifference to his medical care. As to the objective prong, Plaintiff provides no evidence that he is *currently* experiencing any kind of mental health crisis that could meet the threshold for a deliberate indifference claim. As his counsel and Hennepin County indicated, Plaintiff resides in a mental health unit, he is receiving medication, and he is "doing fairly well" in jail. Boese Decl. ¶ 2. While the Commissioner does not minimize the seriousness of Plaintiff's alleged underlying mental health condition, a serious underlying or chronic condition without any urgent or immediate presentation of symptoms is not an "objectively serious medical need[]." *Cf. Jones v. Minnesota Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008) (collecting cases where the Eighth Circuit determined an objectively serious medical need existed where the detainee "exhibited physical symptoms related to known medical issues or to complaints of pain" but not based on known medical issues alone).

But even assuming Plaintiff's mental health symptoms rise to the level to meet the objective prong, Plaintiff presents no evidence that a policy or custom of the Commissioner has led to a party being deliberately indifferent Plaintiff's mental health needs following his January 8, 2024 commitment order.[18] The evidence in fact shows the opposite.

In January and early February 2024, Hennepin County records indicate Plaintiff's mental health was relatively stable. ECF No. 19-2, at 224–25. And when Plaintiff began decompensating after he stopped taking his prescribed neuroleptic medication, Plaintiff's treatment team quickly petitioned the commitment court for authorization to treat Plaintiff with these anti-psychotic medications. *Supra* pp. 10–11. While the commitment court was ready to hear the petition within the statutorily prescribed fourteen-day period, *see* Minn. Stat. § 253B.092, subd. 8(a), Plaintiff agreed to continue the hearing for another two weeks so his medical provider could be present at the hearing. *Id.* Then, at the March 22, 2024 hearing, Plaintiff did not object to the commitment court entering the *Jarvis* order. Boese Decl. Ex. 18, at 1 ("Respondent did not object to the issuance of this Order . . . .").[19] The commitment court authorized the administration of neuroleptic medication in a written order filed one business day later. *Id.*

---

[18] Although Plaintiff has been detained in jail since June 2023, he was not civilly committed to the Commissioner until January 8, 2024. ECF No. 2, ¶ 87.

[19] Plaintiff's decision to continue his *Jarvis* hearing for two weeks is strange given that he did not oppose the petition. Had he simply insisted on going forward with the originally scheduled hearing on a petition he did not oppose, his treatment team would have presumably received authorization to treat him with neuroleptic medication two weeks earlier.

Accordingly, not only is there no evidence of a policy or custom of the Commissioner that was a "moving force" being a government official being deliberately indifferent to a serious medical need, there is no evidence that any government official was deliberately indifferent to *any* serious medical need that created an "excessive risk" to Plaintiff. Given Hennepin County's affirmative action to seek court authorization to administer neuroleptic medication to Plaintiff, his allegation that *any* government official was "deliberately indifferent" to a serious medical need strains credulity.[20]

### 2. Plaintiff Is Not Likely To Succeed On His Claim For Punitive Conditions of Confinement (Count VII).

Conditions of confinement claims brought by civilly committed persons in the Eighth Circuit are evaluated under the *Bell v. Wolfish*, 441 U.S. 520 (1979) standard, namely whether the challenged condition "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Karsjens v. Lourey*, 988 F.3d at 1052–53 (quoting *Bell*, 441 U.S. at 538). A detainee may show either: (1) that the challenged conditions were intentionally punitive; or (2) that "the conditions were not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose." *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020). Accordingly, "if a particular condition or restriction of pretrial detention is

---

[20] As stated above, an injunction against Dr. Stevens is inappropriate because she is sued only in her individual capacity. But if the Court rejected this established case law for some reason, these same arguments apply equally to any deliberate indifference claim against Dr. Stevens, in her individual capacity.

reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539.

Here, Plaintiff is not likely to succeed on this claim because (1) his allegations are more appropriately analyzed as a deliberate-indifference claim and not a conditions-of-confinement claim, (2) detention in jail while civilly committed does not alone establish punitive conditions, and (3) any delayed admission to a state-operated treatment facility is reasonably related to a legitimate government purpose.

### a. Plaintiff Does Not State A Conditions-of-Confinement Claim.

With respect to his claim against the Commissioner, Plaintiff does not challenge any particular condition of the Hennepin County jail as punitive. Rather, his challenge is to the alleged lack of mental healthcare provided during his detention. But as discussed above, such a claim is analyzed under the deliberate indifference standard, not the *Bell* standard. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006) (deliberate indifference standard applies where claim is "not based on a pretrial detainee's right to be free from punishment but [rather] grounded in principles of safety and general well-being"); *Goldsmith v. Heffner*, No. 1:21-CV-00136-SRC, 2022 WL 503723, at *6 (E.D. Mo. Feb. 18, 2022) (following *Butler* to apply deliberate indifference to dismiss punitive conditions claims based on medical treatment allegations). Plaintiff is not likely to succeed on a deliberate indifference claim against the Commissioner.

In addition, under either the deliberate-indifference or *Bell* standard, Plaintiff is not likely to succeed because, as previously stated, the Commissioner does not have physical

custody of Plaintiff and is therefore not legally responsible for his conditions. *See DeShaney*, 489 U.S. at 199–200; *Briggs*, 472 F. Supp. 2d at 1313; *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001) (requiring personal involvement to state a section 1983 claim). Like his deliberate-indifference claim, any claim for unconstitutionally punitive conditions of confinement would be against Hennepin County, not the Commissioner.

> **b.    Detention in Jail While Waiting For A Medically Appropriate Bed Does Not Alone Establish Punitive Conditions.**

Plaintiff does not claim that any specific conditions in the Hennepin County jail are unconstitutionally punitive; he instead argues that detention in jail waiting for a medically appropriate bed, following his civil commitment, is unconstitutionally punitive. *See generally* ECF No. 16, at 11–16.

As an initial matter, Plaintiff does not have a constitutional right to mental health treatment for the illness that triggered his involuntary confinement. *Bailey v. Gardebring*, 940 F.2d 1150, 1153 (8th Cir. 1991) ("We turn first to Bailey's asserted right to treatment. . . [he] simply does not have the constitutional right he claims."); *Elizabeth M. v. Montenez*, 458 F.3d 779, 788 (8th Cir. 2006) (rejecting a claim of a "due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement."); *Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012) (same); *Karsjens v. Piper*, 845 F.3d 394, 410 (8th Cir. 2017) (same); *Karsjens v. Lourey*, 988 F.3d 1047, 1051 (8th Cir. 2021) (same).

Second, the Commissioner does not dispute that, as a policy matter, it is preferable for a person who is civilly committed due to his mental illness to be treated outside of a

jail setting.[21]  But that said, it is well established that pretrial detention is not *per se* unconstitutional.  *U.S. v. Salerno*, 481 U.S. 739, 751 (1987) (pretrial detention does not "offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.").  Indeed, as Judge Tostrud recently observed when dismissing a nearly identical claim in a similar lawsuit, the fact that a treatment facility may provide a better location for treatment than a jail "does not plausibly show that jail conditions encountered by [Plaintiff] or civilly committed persons generally either lack any reasonable relationship to a legitimate government purport or are excessive in relation to such purpose."  *Dalen v. Harpstead*, No. 23-cv-1877, 2024 WL 169109, at *9 (D. Minn. Jan. 16, 2024).  The *Dalen* court further noted that accepting a theory like the one put forth by Plaintiff "would necessitate holding that every civilly committed person jailed on criminal charges is, by virtue of their civilly committed status, subject to punitive conditions."  *Id.*  But Plaintiff has not cited any authority for this broad proposition, nor is the Commissioner aware of any.

It is important to note that the Commissioner does not require patients to remain in jail pending a medically appropriate bed.  Stevens Decl., ¶ 4.  In this case, Plaintiff was first ordered detained in jail in his criminal case.  Boese Decl. Ex. 3.  His continued detention in jail appears to be a result of the commitment court's hold order and the criminal

---

[21] This may not always be the case, as it is conceivable that a jail could choose to create a robust mental health unit for the treatment of detainees who suffer from mental illnesses. Indeed, the affidavit relied on by Plaintiff only discusses jails vs. treatment facilities in a broad, general matter, and contains no specific information regarding the mental health treatment Hennepin County jail can or does provide to Plaintiff.  *See generally* ECF No. 2-1.

court's detention order. Boese Decl. Exs. 4, 7. To date, Plaintiff has not contested either order. DHS does not condition Plaintiff's admission to FMHP on him remaining in jail; indeed, DHS will admit a patient to FMHP from any location. Stevens Decl., ¶ 4.

### c. Maintaining A Waiting List For Individuals Civilly Committed To The Commissioner's Care Is Reasonably Related To A Legitimate Government Interest.

That Plaintiff filed a conditions-of-confinement claim against the Commissioner is strange, given her lack of control over the conditions at the Hennepin County jail. The only conceivable "condition" that the Commissioner could arguably be subjecting Plaintiff to is DHS's placement of Plaintiff on a waiting list for admission to FMHP until a medically appropriate bed is available. But the record before this Court demonstrates that this action is reasonably related to multiple legitimate governmental purposes. For example, waiting to admit Plaintiff until a medically appropriate bed is available ensures that DHS can provide effective and safe mental health treatment not just to Plaintiff, but also to the other patients at FMHP. Stevens Decl., ¶ 26. It also keeps patient ratios at levels that will adequately protect both staff and patients, and it ensures FMHP remains licensed to provide services to hundreds of Minnesotans each year. *Id.*, ¶ 6.

DHS's need to use a waiting list, and to place Plaintiff on this waiting list, is reasonably related to these purposes. FMHP does not have infinite beds. As discussed above, many factors out of the control of DHS have led to the situation in which the State finds itself, such as the rate of commitments outpacing the number of treatment beds available, the lack of community placements available for patients who no longer require inpatient mental health treatment, staffing shortages, and that historically there has been a

lack of appropriations from the Legislature to increase capacity. Stevens Decl., ¶ 18. In short, the waitlist is DHS's way of managing the scarce resources that it has in the best way possible. Notably, the Priority Admission Task Force's recent report reinforced this fact:

> There is insufficient capacity in DCT programs, despite the extensive and successful efforts by DCT to streamline processes, efficiently utilize existing resources, and expand transition options.

ECF No. 18-1, at 27.

Finding similar issues to the ones facing DHS, the District of Kansas recently denied a preliminary injunction to pretrial detainees who were found incompetent to stand trial and were awaiting admission to a state treatment program. *See Glendening v. Howard*, – F. Supp. 3d –, 2023 WL 8715814 (D. Kan. Dec. 18, 2023). The court concluded that the state hospital's waitlist was reasonably related to a legitimate government interest in providing adequate care to patients under its care:

> State hospitals lack infinite capacity. Sometimes, a detainee must wait. The State has a continued interest in evaluating and restoring the competency of each detainee so that he or she may be tried. The State has a further interest in providing adequate care at [the state hospital] to accomplish that purpose, which obliges detainees to wait in line until services are available. Detainees must wait for inpatient services because numerous pressures outside of [the state agency's] direct control have simultaneously increased demand for treatment and created staffing shortages. [The state agency] addresses these issues with a waitlist. Although the waitlist is long, is not indefinite. It reflects [the state agency's] effort to manage the numerous external factors affecting admission rates at [the state hospital]. In other words, [the state agency] maintains the waitlist in order to facilitate its process for competency evaluation and restoration. The resulting delay and the State's purpose appear "reasonably related," because [the state agency] only delays as a way to triage care.

*Id.* at *11.

Plaintiff cites a handful of cases for the proposition that the state does not have a legitimate government interest in keeping incompetent criminal defendants in jail because doing so is incompatible with restoring their competency to stand trial. Plaintiff, however, was not civilly committed for the purpose of regaining his competency to stand trial; rather, he was civilly committed because, based on his mental illness, he "presents a clear danger to the safety of others," and "there is a substantial likelihood that [he] will engage in acts capable of inflicting serious physical harm on another." *See* Minn. Stat. § 253B.02, subd. 17 (defining a "person who has a mental illness and is dangerous to the public"). His civil commitment is therefore separate from, and unrelated to, his competency to stand trial. *See* Minn. Stat. § 253B.19, subds. 7, 15 (identifying the standards for Plaintiff to be provisionally discharged or discharged from his commitment, none of which are whether he regains competency to stand trial); *see also Dusky v. United States*, 362 U.S. 402, 402 (1960) (stating a person is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him"); Minn. R. Crim. P. 20.01, subd. 2 ("A defendant is incompetent and must not plead, be tried, or be sentenced if the defendant due to mental illness or cognitive impairment lacks ability to: (a) rationally consult with counsel; or (b) understand the proceedings or participate in the defense.").

This distinction is important because the cases Plaintiff cites generally stem from *Jackson v. Indiana*, which held that when a criminal defendant "is committed *solely* on account of his incapacity to proceed to trial," he "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will

attain that capacity in the foreseeable future." 406 U.S. 715, 738 (1972) (emphasis added). But because Plaintiff is not committed "solely" on account of his incapacity to proceed to trial, *Jackson*'s holding is inapposite, as are the cases that stem from that decision.

Moreover, *Jackson* provides little guidance regarding what constitutes a "reasonable duration" of confinement in jail.[22] 406 U.S. at 739 (declining to prescribe "arbitrary time limits" due to differing state facilities and procedures). But contrary to Plaintiff's argument and the cases cited by him, *Jackson* does not forbid all pretrial detention; it only forbids *irrational* pretrial detention. *Id.* at 738. Accordingly, even if *Jackson* applied, the question for this Court is whether DHS's actions (i.e., maintaining a waiting list for admission to FMHP) is reasonably related to its asserted interest in providing safe and appropriate mental health treatment to Plaintiff and the other civilly committed individuals at FMHP. As discussed above, it plainly is, and Plaintiff's motion fails to provide *any* evidence that DHS's waitlist is not reasonably related to these legitimate government interests.

Because Plaintiff cannot show he is likely to succeed on the merits, his motion should be denied. *See Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 113 (8th Cir. 1997) ("If a plaintiff's legal theory has no likelihood of success on the merits, preliminary injunctive relief must be denied."); *Planned Parenthood Minn. v. Rounds*,

---

[22] If Plaintiff believes that the duration of his confinement in jail is unconstitutional, he must make that challenge through a habeas petition, not a section 1983 action. *Heck v. Humphrey*, 512 U.S. 477, 481 (1994) (holding that a state detainee cannot challenge the legality of his confinement in a federal civil rights action); *Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973) (stating that a petition for writ of habeas corpus, not a § 1983 action, "is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement").

530 F.3d 724, 732 (8th Cir. 2008) ("If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other *Dataphase* factors.").[23]

### B. Plaintiff Failed To Provide Evidence Of Irreparable Harm.

Plaintiff has not provided evidence that he will suffer irreparable harm absent an injunction that requires DHS to admit him to a state-operated treatment facility.

A "plaintiff has the burden of providing a clear showing of immediate irreparable injury." *Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1058 (D. Minn. 2013). To demonstrate a threat of irreparable harm, the harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport, Iowa*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Plaintiff's primary argument regarding irreparable harm is his belief that the Hennepin County jail is not providing him with adequate medical treatment for the simple fact that it is a jail, and not a state-operated treatment program. But as discussed above, the Hennepin County jail has a constitutional responsibility to provide him with adequate medical care. Yet, for whatever reason, Plaintiff did not seek injunctive relief against Hennepin County to provide what he believes is constitutionally adequate medical care to

---

[23] Again, these same arguments apply equally to Dr. Stevens in the event the Court were to conclude Plaintiff could seek an injunction against her in her individual capacity.

him while in jail.  Plaintiff therefore cannot claim that he is at risk of suffering "irreparable" harm when he has not even attempted to remediate the purportedly unconstitutional conditions of his confinement with the party that can change his conditions.  If it is true, as Plaintiff claims, that the conditions of his confinement at the Hennepin County jail are in fact unconstitutional, the harm he is purportedly suffering is patently reparable, as he could ask this Court to order that Hennepin County remedy the allegedly unconstitutional conditions of his confinement.

In any event, Plaintiff provides no affirmative evidence that the Hennepin County jail is, in fact, causing him irreparable harm.  He provides no affidavit himself in support of his motion.  His purported "experts" who provided a declaration in support of his Complaint provide no opinion about the care Plaintiff has received while in Hennepin County's custody.  *See generally* ECF No. 2-1.  Furthermore, during a recent call with the Court, Plaintiff and Hennepin County both indicated that Plaintiff is medication compliant, being treated in the jail's mental health unit, and doing well.[24]  Boese Decl. ¶ 2.  Plaintiff has offered no evidence that the treatment he is currently receiving in the mental health unit of the Hennepin County jail is constitutionally inadequate.

While Plaintiff cites some isolated incidents that have occurred since his commitment order, *see* ECF No. 16, at 9, none of these incidents post-date the commitment court authorizing Hennepin County to treat Plaintiff with neuroleptic medication.  *See* ECF

---

[24] DHS Defendants attempted to obtain jail records to corroborate counsel's representations to the Court, but Hennepin County indicated it could not provide them to DHS without a protective order.  Boese Decl. Ex. 19.  Counsel for Hennepin County requested that DHS rely on her representations to the Court.  *Id.*

No. 16, at 9 (citing records from January and February 2024). It is simply not true for Plaintiff to say that his mental illness is not being treated at this point. The same records cited by Plaintiff indicate that he had previously been offered to go to general population, but he declined. ECF No. 19-2, at 224–25. The purported "denial" of Plaintiff's access to commissary was because he had excessive commissary that filled three large garbage bags, and he "continually over orders commissary items." *Id.* at 214–15.

Finally, Plaintiff claims he is suffering irreparable harm because he believes it will now take longer to get discharged through the SRB. This is highly speculative and not of the "certain and great" harm of "such imminence" that requires equitable relief.[25] *Roudachevski*, 648 F.3d at 706. This factor also weighs against an injunction.

### C. Public Policy Favors Giving Effect To Duly Enacted State Law And Denying The Injunction.

Public policy favors following state law and judicially recognized interests. In Minnesota, public policy can be expressed in state statutes. *Dahlberg Bros., Inc. v. Ford Motor Co.*, 137 N.W.2d 314, 322 (Minn. 1965) (noting public policy is "expressed in the statutes"); *Phipps v. Clark Oil & Ref. Corp.*, 396 N.W.2d 588, 593 (Minn. Ct. App. 1986) (observing that public policy can be derived from "clear mandates of legislative or judicially recognized public policy"). Here, all funding for DCT treatment programs must be appropriated by the Legislature, and the Legislature has not funded sufficient beds for

---

[25] Notably, there is no requirement in the statute that a person must complete, or even participate in, DHS's treatment program to receive a reduction in custody. *See* Minn. Stat. § 253B.18, subds. 6, 7, 15; *see also In re Hatton*, No. A22-717, 2022 WL 16544355 (Minn. Ct. App. Oct. 31, 2022) (affirming reduction in custody to nonsecure facility despite the respondent's non-participation in treatment over the prior nine years).

DHS to admit each patient who needs one.  *See* Stevens Decl., ¶ 27; Glancey Decl., ¶¶ 22, 24.

Furthermore, during last year's session, the Legislature amended the priority admission statute to make clear that the Commissioner was not required to admit an individual to a state-operated treatment center until *after* a medically appropriate bed is available.  *See* Minn. Stat. § 253B.10, subd. 1(e) (2023).  This amendment emerged from a reasoned and deliberative legislative process.

Finally, granting Plaintiff's motion would encourage patients to sue to attempt to be admitted before other patients who have been waiting a longer time for a medically appropriate bed.

> **D.  Plaintiff's Requested Injunction Will Harm Other Individuals Who Are Also Waiting For A Medically Appropriate Bed.**

In considering whether to issue a temporary injunction, courts must balance the injury alleged by the movant with the injury the injunction would inflict on other parties. *Pottgen v. Missouri State High School Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). The Court's goal is to "assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015).

Here, the balance of harms does not favor granting the injunction.  As discussed above, if Plaintiff believes the conditions of the Hennepin County Jail are constitutionally infirm, he can seek injunctive relief against the County to remedy the alleged deficiencies. Conversely, granting his injunction will harm other individuals who have civil commitment

orders earlier than him, and who are also waiting for a medically appropriate bed to become available.  This final *Dataphase* factor also weighs against Plaintiff's requested injunction.

## CONCLUSION

Based on the foregoing, DHS Defendants respectfully request that the Court deny Plaintiff's motion for a preliminary injunction.  His requested injunction is not likely to succeed on the merits, he fails to demonstrate irreparable harm, and the balance of harms and public policy weighs against the injunction.  It also seeks to upset the status quo, which is the opposite of the purpose of a preliminary injunction.

Dated:  May 28, 2024

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Brandon Boese**
BRANDON BOESE
Assistant Attorney General
Atty. Reg. No. 0396385

SCOTT H. IKEDA
Assistant Attorney General
Atty. Reg. No. 0386771

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1414 (Voice)
(651) 282-5832 (Fax)
brandon.boese@ag.state.mn.us
scott.ikeda@ag.state.mn.us

*Attorney For Defendants Jodi Harpstead,*
*In Her Official Capacity, And Dr. KyleeAnn*
*Stevens, In Her Individual Capacity*

|#5793374