UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| John Doe,<br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>Hennepin County; Hennepin Healthcare System, Inc.; Laura Sloan, M.D., *in her individual capacity*; Minnesota Department of Human Services Commissioner Jodi Harpstead, *in her official capacity*; KyleeAnn Stevens, M.D., *in her individual capacity*; and Jane Doe 1, *in her individual capacity*,<br><br>　　　　　　　Defendant. | Case No. 24-cv-01392 (NEB/DTS)<br><br>**DECLARATION OF<br>KYLEEANN STEVENS, M.D.** |

　　I, KyleeAnn Stevens, M.D., state as follows:

　　1.　　I am a forensic psychiatrist employed by the Minnesota Department of Human Services as the Executive Medical Director for Behavioral Health. As the Executive Medical Director, I oversee care and treatment at all of DHS' treatment programs which are within the Direct Care and Treatment (DCT) division of DHS.

　　2.　　One of my primary duties as Executive Medical Director is to oversee and approve the admission of civilly committed individuals to DCT facilities. This includes admissions to the Forensic Mental Health Program (FMHP), formerly known and recognized in statute as the Minnesota Security Hospital.

　　3.　　The FMHP facility is licensed by the Minnesota Department of Health as a supervised living facility, while the program is licensed by the Minnesota Department of

Human Services as a Residential Facility for Adults with Mental Illness.

4. About ninety-six percent of the patients served at FMHP are individuals civilly committed as mentally ill and dangerous (MI&D). The remaining patients are a combination of individuals civilly committed as mentally ill or developmentally disabled whose needs are unable to be met in another setting. The patients served have highly complex psychiatric conditions, may exhibit volatile or violent behaviors, and in the majority of cases have been committed explicitly to the secure treatment facility FMHP. DHS does not require a person to be residing in any particular location before it will admit the person.

5. DHS is only permitted to spend money that has been appropriated by the Legislature for a specific purpose.

*Admissions to DCT Programs*

6. Dr. Joshua Griffiths is the Director of Psychiatry, Forensic Services. He is delegated responsibility through DCT's medical director chain of command to review referrals for admission to FMHP and determines who is appropriate for placement based on available beds, staffing, and individual patient's clinical needs. Dr. Griffiths reports to Dr. Soniya Hirachan, Medical Director and Executive Director of Forensic Services. Dr. Hirachan reports directly to me on issues related to her role as Forensic Services Medical Director. Dr. Griffiths can only admit a patient to FMHP if FMHP is capable of safely serving that patient and others. Admitting more patients than can be safely served given patient acuity, milieu acuity, anticipated patient needs, physical plant limitations, staffing limitations, and regulatory requirements puts existing patients and new patients, as well

2

as staff, at significant risk. It also could lead to regulatory citations from its licensing entities. Admitting too many patients could also jeopardize the licensure of FMHP physicians and other licensed staff and place them, as well as other FMHP direct care staff, at risk of being subject to findings of maltreatment or neglect of patients, rendering them ineligible to provide direct care.

7. As Executive Medical Director, admission decisions are made under my authority, with significant and regular input from program medical directors and clinical leadership. Admission decisions are ultimately medical decisions.

8. The admissions process described below is used for every priority referral that DCT receives.

9. DCT reviews and evaluates admissions referrals through its highly trained Central Preadmissions (CPA) team, which reports to me. The staff of CPA primarily consists of registered nurses and other trained staff, who do initial triage for admissions to DCT programs. CPA staff work 24 hours a day, 7 days a week, to keep DCT beds filled.

10. Because the Commissioner is not a party to civil commitment proceedings, the only way DHS knows someone has been civilly committed to its care is if DHS is sent the commitment order. Following receipt of a civil commitment order, CPA staff will request any applicable medical records or jail records (e.g., jail logs, incident reports, jail medical information and a verbal report from jail staff), as well as copies of any applicable criminal orders. In many cases, CPA will also have contact with the referred individual's facility social worker or county case manager to obtain additional

information and facilitate ongoing communication. If available and known to DCT at the time of referral, CPA staff may also contact other community health care providers or facilities that have served the individual in the recent past to request records, as allowed by law.

11. If the individual is civilly committed as MI&D and referred for admission to FMHP, CPA staff first determine if the individual qualifies for priority admission under Minnesota Statutes section 253B.10. CPA maintains a waitlist for available beds at FMHP that categorizes individuals who qualify for priority admission and individuals who do not. When a bed at FMHP is forecast to be open on an admission unit, Dr. Griffiths typically requests referral information for the top three to five individuals on the FMHP priority admission waitlist. He will then evaluate each individual's treatment needs to determine whether they are appropriate for the anticipated bed opening. Factors such as whether the individual requires a single-gender milieu due to individual patterns of sexually problematic behaviors, the individual's identified gender identity, reduced opportunities for interaction with peers, increased supervision needs, and the present patient mix on a particular unit are considered. The vast majority of the time, the forecasted bed is deemed medically appropriate for the individual at the top of the waitlist.

12. FMHP's priority admission waitlist is ordered by date that CPA confirms through documentation that the referral qualifies for priority admission. Generally, individuals are admitted to FMHP based on their position on the waitlist, subject to limited exceptions. For example, an individual may be admitted "out of order" from the

waitlist if a bed becomes available on a unit that individuals closer to the top of the waitlist are not clinically appropriate for. Such a case may occur when a female is fifth on the waitlist, but the only bed that is available is on an all-female unit, thus allowing the female to be admitted to the bed before any male individuals on the list. Another limited exception is made if a person is dually committed to both the Department of Corrections (under a criminal sentence) and DHS (under a civil commitment order), residing in prison, and the prison sentence is set to expire. DHS has historically prioritized the admission of these individuals due to their expiring prison sentences, even if they are not on the priority admission waitlist. FMHP also had to make one emergency admission of a person from HCMC this year due to extremely high acuity. There are very few people that would be appropriate for the unit to which this person was admitted because it would be too restrictive, as it has only one or two beds with very little social/recreational opportunities. Therefore, the bed to which this individual was admitted would not be medically appropriate for most others.

13. CPA staff offer to connect jails with mental health providers in DCT for purposes of clinical support while admissions are pending on the waitlist. The staff in that office are available 24 hours a day, seven days a week and can provide a bridge to DCT providers for consultation and advice. It is my understanding, however, that staff at the Hennepin County jail rarely reach out to CPA to request clinical consultations.

14. Because FMHP is a residential facility with tiered levels of care, it maintains a small number of beds to create a margin of safety for patients who need to emergently transfer to a unit that provides a higher level of care. FMHP also needs to be

able to accommodate voluntary returns and emergency revocations for individuals who are committed as MI&D and on provisional discharge in the community. None of these scenarios can be predicted, which is why FMHP must keep these beds open. As of today, there are 245 individuals committed as MI&D and on provisional discharge in a community setting. In 2023, twenty-three individuals committed as MI&D and on provisional discharge required emergency revocation back to FMHP. In my professional medical opinion, these open beds are necessary for FMHP because it is the only facility which can accommodate this population, by statute. Failure to plan for these scenarios is not only prudent, it is necessary. But, when there is an anticipated opening for an admission-level bed outside the small reserve of beds maintained for internal transfers and returns from the community, Dr. Griffiths notifies CPA that the individual he has identified for admission can be admitted. FMHP's admission acceptance is typically communicated to CPA one week in advance of the anticipated admission date. CPA staff then notify the jail and case manager of the expected admission date for the individual so that the referral can be admitted within 48 hours of a medically appropriate bed becoming available. At times, new admissions do not arrive within this time period for reasons outside of FMHP's control, such as law enforcement not transporting an individual to FMHP for admission for several days beyond when admission was available.

15. FMHP's referral population has become increasingly more challenging due to a significant increase in individuals being civilly committed as MI&D.

*FMHP Treatment Capacity & Issues Impacting Capacity*

16. Treatment capacity at FMHP is dependent on numerous factors and requirements, and it is subject to its licensure by MDH and DHS. On any given day available treatment bed capacity can vary, depending on the acuity of the current patients as well as the anticipated needs of referred individuals, and other variable factors such as COVID-19 outbreaks, physical plant issues, etc.

17. High acuity patients (patients who are experiencing severe or volatile symptoms of their mental illness) require more physical space, separation from other patients, privacy, and a higher staff-to-patient ratio, all of which can impact and reduce overall treatment bed capacity at FMHP.

18. Other factors also directly and significantly impact FMHP program bed capacity and admissions timelines, including discharge delays for current patients; lack of community placement options; staffing shortages; changes in the patient population; and COVID-19 disruptions.

19. FMHP cannot admit new patients, even priority admission patients, until it can safely move patients to lower levels of care within the program or discharge patients who no longer need FMHP's care. FMHP cannot, on its own, transfer, provisionally discharge, or discharge patients who are committed as MI&D. Patients committed as MI&D must go through a statutory reduction-in-custody process in order to be transferred from a secure unit to a non-secure unit, provisionally discharged from the facility, or fully discharged from civil commitment. That involves petitioning the Special Review Board and, potentially, review by the Commitment Appeal Panel. That process

can take many months, or even years, to complete.

20. Even when patients are granted provisional discharge by the Commissioner or Commitment Appeal Panel, FMHP can't discharge current patients until an appropriate community placement has been identified that has an available bed. Under Minnesota law, counties are tasked with developing, implementing, and monitoring plans for an individual provisionally discharged under an MI&D commitment, including coordination of necessary support services. As such, county case managers are integral to the provisional discharge planning process, and generally, that planning cannot go forward if the county does not actively participate, does not agree to the community placement, or does not agree to fund the community placement and ongoing treatment needs for the patient.

21. Discharge delays may result from a variety of reasons, but typically the most common cause of a discharge delay is a lack of community placement for the person. Most of the patients at FMHP have intensive psychosocial needs and criminal justice history, and some of them have predatory offender designations. Accordingly, the vast majority of patients need to provisionally discharge from FMHP to a structured setting that has increased supervision and monitoring. It would be an exceedingly rare case that an individual could provisionally discharge from FMHP directly to an independent living setting. Minnesota is currently experiencing a notable shortage of community-based care providers, such as group homes, adult foster care homes, and Intensive Residential Treatment Services programs. Of the available providers, some are unwilling to accept individuals who are committed as MI&D or who have predatory

offender designations, making the pool of options even smaller. This further constricts community-based placement options and leads to discharge delays.

22. In most cases, counties are making efforts to find appropriate placements for patients ready for discharge from FMHP, but there are simply not enough community providers to meet the current demand. Without an increase in community-based providers, discharge delays will remain, counties will not be able to secure community placements, and FMHP beds will continue to be occupied by individuals who no longer need that level of care.

23. Provisional discharges from FMHP, however, do not directly translate into open beds that can accommodate new admissions. The majority of provisional discharges from FMHP involve individuals who reside on a non-secure unit within the program. A new admission to FMHP who is committed as MI&D cannot reside on a non-secure unit without going through the reduction in custody process. Bed turnover on units that accommodate new admissions within FMHP does not happen until a patient residing on one of those units demonstrates a level of safety and stability that allows them to move to a lower level of care after going through the reduction in custody process (if committed as MI&D).

24. Treatment capacity isn't just measured in the number of physical beds at a facility. A health care program also must have the right number and mix of highly trained and skilled staff. FMHP has experienced significant staffing shortages over the past three years. Like many health care systems in Minnesota and nationwide, FMHP has struggled to recruit and retain personnel, especially highly skilled nurses and many other direct

care staff who care for, assist, and monitor FMHP's unique patient population. While there has been a positive shift in staffing, the vacancy rate at FMHP is still high for critical positions. The vacancy rate for nursing across the program is 23% (and 26% within the secure treatment units). The vacancy rate for direct care staff across the program is 19% (and 21% within the secure treatment units). By comparison, the industry standard is 12% for staff vacancies.

25. FMHP's license variance with DHS requires FMHP to run at a capacity where patients have access to prompt and appropriate responses to emergent needs. It also requires the staffing level and ratio to be such that staff can safely supervise and direct the activities of individuals, taking into account the individuals' behavioral and psychiatric stability, treatment needs, cultural needs, vulnerabilities and all services provided by the program. Thus, even if FMHP had physical beds available, the program cannot accept more patients if it cannot maintain appropriate staffing ratios to ensure safety and security. Treatment capacity is also diminished when current patients are highly symptomatic, aggressive or have challenging behaviors that require very close support. For example, a patient who needs a low stimulus or highly sterile environment may need to be placed alone on FMHP's high acuity, four bed unit. But that small unit cannot be replicated within other areas of FMHP, so a subsequent referral who has similar needs would need to wait for a medically appropriate bed to become available on that four-bed unit, or they may be admitted to a different high acuity unit and FMHP would need to increase the staffing ratio and possibly make environmental modifications to accommodate that admission. Both scenarios impact and limit the number of patients

FMHP can safely admit and treat.

26. Beyond statutory, regulatory, and licensing requirements, FMHP also regulates the admission of new patients through use of the priority admission and non-priority admission waitlists in order to keep staff and patients safe. Ensuring that patients are admitted to medically appropriate beds, in coordination with the medical and treatment needs of other admitted patients, FMHP is able to provide effective mental health treatment in line with best practices for similar facilities.

27. As a medical doctor and the Executive Medical Director, my goal is to provide high quality, person-centered care to every Minnesotan who needs treatment in a state-operated program. I would very much prefer that FMHP could immediately provide a medically appropriate bed to every person who needs one and could expeditiously discharge every individual in our care to an appropriate location when they no longer require our care. However, in practice and under the law, it is simply not possible to do either of these things at this time given the resources appropriated to DHS, the state and nation-wide health care worker shortages, the statutory process that must be followed to move MI&D patients to less restrictive settings, the limited number of community discharge options available, and other factors discussed above. Under these circumstances, I have no choice but to triage referrals to FMHP and utilize waitlists for admission. Individuals that fall under the priority admission law are consistently and intentionally prioritized ahead of other admissions. FMHP continues to diligently work to safely admit as many patients as we can, as quickly as we can.

28. In January 2024, Mr. Doe was civilly committed as MI&D to FMHP. Mr.

Doe was added to the priority admission waitlist for FMHP the same day his commitment and criminal orders were received by CPA, at position 16. As of ▮▮▮▮ 2024, ▮▮▮▮▮▮▮▮▮▮▮▮▮ the priority admission section of the waitlist for FMHP. The individual at the top of the list was referred for admission to FMHP in ▮▮▮ 2023 and is scheduled to admit on ▮▮▮ 2024. The next two individuals were referred for admission to FMHP in ▮▮▮ 2023.

29. As of the time I executed this declaration, FMHP is operating at full capacity. All medically appropriate beds are filled with patients or scheduled for new patient admission. Other than the limited number of beds FMHP keeps open for emergencies, all medically appropriate beds available for priority admissions are currently full or otherwise scheduled to take admissions that predate Mr. Doe's commitment order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28, 2024
Scott County,
State of Minnesota

*s/ KyleeAnn Stevens*
KYLEEANN STEVENS