# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John Doe,

        Plaintiff,

    v.

Hennepin County; Hennepin Healthcare
System, Inc.; Laura Sloan, M.D., *in her
individual capacity*; Minnesota
Department of Human Services
Commissioner Jodi Harpstead, *in her
official capacity*; KyleeAnn Stevens,
M.D., *in her individual capacity*; and
Jane Doe 1, *in her individual capacity*,

        Defendants.

Case No. 24-cv-01392 (NEB/DTS)

**REPLY MEMORANDUM
SUPPORTING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION**

## INTRODUCTION

State Defendants' response to Plaintiff's Motion for Preliminary Injunction makes

three main arguments. First, State Defendants seek to offload responsibility for DHS'

unconstitutional conduct onto Hennepin County, claiming that because Plaintiff is housed

at the Hennepin County jail, DHS has no constitutional obligations toward him. But the

case law considering this issue establishes otherwise – a state agency that assumes legal

custody of a civilly committed individual does not escape its constitutional responsibilities

toward that individual simply because he is being housed in a county jail.

Second, State Defendants argue that Plaintiff is unlikely to succeed on the merits of

his constitutional claims. Other courts have routinely found constitutional violations under

1

exactly the situation presented here, however, and Plaintiff is likely to succeed on these claims. It is well-established that a state's failure to promptly transfer a civilly committed individual from jail to the appropriate mental health facility violates that individual's due process rights.

Finally, State Defendants argue that its constitutional violations should be excused because it lacks sufficient resources. Again, the case law says otherwise. Lack of resources does not excuse unconstitutional conditions or conduct. And this is as it should be. The State should not be allowed to engineer a situation in which it assumes custodial responsibility for an individual at the same time knowing it lacks the resources to honor the individual's due process rights.

For more than a decade, DHS has known that it cannot promptly admit mentally ill individuals to its facilities after they have been civilly committed to its care. It has known that these individuals will languish in jail waiting for months or years to finally begin getting the treatment they need. It has known that these individuals are suffering. And it has utterly failed to fix the problem. Plaintiff (and other individuals in his position) deserve better, and DHS should be held to account for its failure to meet its obligations under the Constitution, beginning with an injunction that requires DHS to admit Plaintiff to the Forensic Mental Health Program as it should have done six months ago.

<u>**FACTS**</u>

**I.      PLAINTIFF IS BEING HARMED BY HIS ONGOING CONFINEMENT AT THE ADC.**

It has been roughly one year since Plaintiff was arrested and processed into the Hennepin County Adult Detention Center ("ADC"). It has been six months since Plaintiff was committed to DHS custody, and DHS agreed to keep Plaintiff "safe and secure" for the duration of his commitment. Doc. 19. Plaintiff nonetheless remains incarcerated at the ADC.

Until April 22, 2024, Plaintiff was housed in solitary confinement. Since that date, he has been housed in the jail's mental health unit. Even though he is no longer in solitary confinement, Plaintiff is still locked in his 6x8 cell for roughly 20 hours per day. Declaration of John Doe ("Doe Dec.") ¶ 8. Plaintiff has not seen the sky or the sun in a year. *Id.*, ¶ 7. Plaintiff is very close with his parents and siblings, but he has not been able to see them in person since his arrest as the jail does not allow in-person visits. *Id.*, ¶ 9. Plaintiff has no mental health treatment plan. He receives no mental health programming, services, or therapy. *Id.*, ¶ 6. Despite being housed in the "mental health unit," Plaintiff has not seen a psychologist or other mental health professional in over a month. *Id.* Other than daily provision of anti-psychotic medication, he is receiving no care. *Id.* These jail conditions are aggravating Plaintiff's mental illness, increasing his depression and anxiety, and preventing him from making positive progress in restoring his mental health. *Id.*, ¶ 10.

The nature of Plaintiff's confinement – lack of a treatment plan, no therapy, no family contact, no exposure to the outside world – is widely recognized by mental health

providers as contra-therapeutic and substantially harmful to mentally ill individuals. *See* Doc. No. 2-1 at 6-8. The conditions of Plaintiffs confinement violate the patient rights outlined in the Minnesota Commitment Act and the Minnesota Patient Bill of Rights, not to mention the Constitution. *See* Minn. Stat. § 253B.03, subd. 3 (providing right to receive visitors), subd. 5 (providing the right to periodic assessment), and subd. 7 (providing the right to a treatment plan and the provision of mental health treatment); Minn. Stat. § 144.651 (requiring treatment plans, no use of isolation, courteous and responsive care, etc.).

Plaintiff is being harmed by his ongoing confinement at the ADC. This is not controversial. Indeed, State Defendants concede that committed individuals are harmed by remaining jailed during their period of commitment. *See* Doc. 23 at 40-41 (arguing that admitting Plaintiff ahead of others on the FMHP waitlist would harm those ahead of him on the list who would remain in jail waiting for a medically appropriate bed).[1]

## II. DHS EXERCISES DISCRETION ON WHO GETS ADMITTED TO THE FMHP AND WHEN THEY GET ADMITTED.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[1] State Defendants hang their hat on comments during the parties' informal status conference that Plaintiff was medication compliant and doing "fairly well" given his circumstances. *See* Doc. 23 at 27. While it is true that Plaintiff has been medication compliant and is psychologically stable at the moment, he is nonetheless being harmed, irreparably, as discussed above.

While DHS apparently maintains a "waitlist," it concedes that patients are routinely admitted out of order off the list. According to State Defendants, patients who are civilly committed and referred to FMHP are "review[ed] and evaluate[d]" by DHS' "highly trained Central Preadmissions staff." Stevens Dec. ¶ 9. Those staff, applying professional judgment and DHS internal criteria, determine whether and when to admit an individual to FMHP. Specifically, FMHP's Director of Psychiatry, Dr. Joshua Griffiths, is responsible for determining "who is appropriate for placement based on available beds, staffing, and individual patient's clinical needs." *Id.*, ¶ 6. When a bed opens up at FMHP, Dr. Griffiths "typically requests referral information for the top three to five individuals on the priority admission waitlist . . . [and] will then evaluate each individual's treatment needs to determine whether they are appropriate for the anticipated bed opening." *Id.*, ¶ 11.

Dr. Griffiths' decision to select an admittee from "the top three to five individuals" on the waitlist, rather than from the top two, eight, or ten, is apparently an exercise of Dr. Griffiths' discretion. The decision of which specific individual from this group gets the available bed is also at Dr. Griffiths' discretion.

Consistent with this exercise of discretion, county social workers routinely reach out to DHS' pre-admissions staff if there is a change in a committed individual's clinical presentation at jail to help staff determine whether the individual's clinical circumstances (*e.g.* decompensation) justify prioritizing his admission. *See* Second Riach Dec. Ex. M,

Transcript, *Ly v. Harpstead*, 70-cv-22-13781 (Minn. Dist. Ct., filed December 2, 2022) at 61:15-62:6.

In short, DHS routinely admits individuals out of order off the waitlist based on a variety of criteria apparently applied at the sole discretion of Dr. Griffiths. Notably, State Defendants have not identified any specific criteria that would preclude Dr. Griffiths from admitting Plaintiff before those who are ahead of him on the waitlist.

## ARGUMENT

## I. THE LEGAL STANDARD.

State Defendants contend that, for several reasons, a higher burden than normal applies to Plaintiff's request for injunctive relief. First, State Defendants argue that because Plaintiff seeks a "mandatory" or "affirmative" injunction altering the status quo, his burden is heightened. But a plaintiff seeking to undo an unconstitutional status quo does not trigger the higher "mandatory injunction" burden. *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998).

Further, even if Plaintiff was subjected to this higher burden, the need to undo the unconstitutional status quo here would weigh strongly in favor of granting the injunction and negate any increased burden. *E.g., Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions are most likely to be appropriate when 'the status quo ... is exactly what will inflict the irreparable injury upon complainant.' ") (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984)).[2]

---

[2]    *See also United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) ("If the currently existing status quo itself is

6

Ultimately, whether the requested injunction upsets the status quo is of minimal importance to determining Plaintiff's motion. If Plaintiff shows a sufficient likelihood of success on his claim that DHS is violating his due process rights, then an injunction is warranted *because* it will upset the unconstitutional status quo.

Second, State Defendants argue Plaintiff "seeks to enjoin enforcement of a duly enacted statute" – Minn. Stat. § 253B.10, subdivision 1(e) - and thus must show more than a fair chance of prevailing on the merits of his claims. But this argument misstates Plaintiff's claims and request for relief. Plaintiff does not seek to invalidate Minn. Stat. 253B.10, subdivision 1(e), which requires that DHS admit him within 48 hours of a medically appropriate bed becoming available. This statute sets a minimum standard for DHS and does not provide the only circumstance by which an individual can be admitted to FMHP. Moreover, as discussed above, DHS concedes that it exercises substantial discretion in how it construes the term "medically appropriate bed," a condition for admission which it applies flexibly to waitlisted individuals. Plaintiff's requested relief would not "enjoin enforcement" of this statute. If anything, his request *seeks* the

---

causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury."); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 814 (3d Cir. 1989*)* ("If the existing 'status quo' is currently causing one of the parties irreparable injury . . . then it is necessary to alter the situation to prevent the injury."); *Canal Auth. of the State of Florida v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974) (explaining that the "focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo"); 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (1995) ("[I]t is regrettable if [judicial hesitancy to disturb the status quo] leads to the denial of an injunction when the important conditions for its issuance have been satisfied.")

enforcement of the statute. Plaintiff simply asks that the Court order DHS make a medically appropriate bed available and admit him promptly.

For these reasons, Plaintiff bears the normal – not heightened – burden for establishing entitlement to injunctive relief.[3]

## II. THE *DATAPHASE* FACTORS WEIGH IN FAVOR OF THE INJUNCTION.

### A. Plaintiff Has Shown a Likelihood of Success on His Deliberate Indifference Claim.

State Defendants contend Plaintiff is unlikely to succeed on his deliberate indifference claim for two reasons. Doc. 23 at 23. First, State Defendants argue that because Plaintiff is not in DHS' "physical custody," he cannot bring a deliberate indifference claim against the agency. That argument is unsupported by case law and lacks merit.

Second, State Defendants argue that "at no point after Plaintiff's commitment was he suffering from such a severe medical need that the deliberate indifference test applies." *Id.* This argument misstates the deliberate indifference test – which looks to whether a plaintiff has a "serious" – not "severe" – medical need. It also ignores the ample case law recognizing that schizophrenia and bipolar disorder are "serious medical needs" for the purposes of deliberate indifference analysis. Thus, this argument also fails.

---

[3]     State Defendants note that injunctive relief is not appropriate for individuals acting solely in their official capacities. Plaintiff has brought individual capacity claims against Dr. Stevens but seeks redress from DHS through its official capacity claims against Commissioner Harpstead. To the extent that the relief Plaintiff seeks in his Motion would require only official acts by Dr. Stevens, Plaintiff agrees that Dr. Stevens should not be enjoined in her individual capacity.

### 1. DHS has constitutional obligations toward Plaintiff even though he is housed at the ADC.

State Defendants argue that because Plaintiff is currently housed at the Hennepin County Jail, they owe him no constitutional obligations. That is not the law. A state agency's failure to promptly transfer a committed individual violates due process regardless of whether or not the individual is in the physical custody of the agency or languishing in jail waiting for transfer. *E.g., Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 944 (E.D. Ark. 2002) (applying deliberate indifference test to state's failure to promptly transfer mentally ill individuals from jail to state hospital); *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (recognizing due process violation for failure to promptly transfer mentally ill individuals from jail to state hospital).

Moreover, Plaintiff is effectively in DHS' physical custody even if being housed at the jail. Plaintiff has been committed to DHS, which has been ordered to "hold [Plaintiff] safe and secure" pursuant to Minnesota's commitment statutes. *See* Doc. 19; Doc. 25-16 at 5. Pursuant to these orders, DHS has complete control over when Plaintiff is transferred from ADC to FMHP. *See id.* Hennepin County, by contrast, has no control over where Plaintiff is housed and when he is transferred to FMHP. Indeed, as detailed in Plaintiff's Complaint, the Hennepin County Sheriff, and other sheriffs, have complained for years about being powerless to address the needs of mentally ill individuals languishing at their jails because of DHS' failure to promptly admit them. *See* Doc. 1 at 47-49, 52-54. State Defendants attempt to offload responsibility for its constitutional violations on Hennepin

County ignores the reality that the State can end these violations through its own exercise of discretion.

State Defendants cite several cases in support of their argument that "lack of physical custody" is fatal to Plaintiff's deliberate indifference claim. But those cases are inapposite. First, State Defendants cite *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989). In *Deshaney*, the plaintiff filed suit "against social workers and local officials who had received complaints that [her] child was being abused by his father but had not removed him from his father's custody." *Id.* at 189. The Court held that "a State's failure to protect an individual against private violence generally does not constitute a violation of the Due Process Clause." *Id.*

But *DeShaney* is inapposite. It considered situations of "private violence" – not the kind of state-sponsored confinement occurring in this case. To the extent *DeShaney* is relevant here, it actually supports Plaintiff's position. *DeShaney* explained: "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200 (citing *Estelle v. Gamble*, 429 U.S., at 103–104); *Youngberg v. Romeo*, 457 U.S., at 315–316). While those were not the circumstances in *DeShaney*, they are here. DHS has affirmatively exercised its power to

take custody of Plaintiff, but at the same time failed to provide for his basic human needs of adequate health care and non-punitive confinement.[4]

Further, *DeShaney* does not cut off Plaintiff's due process claims. In *Ward v. Hellerstedt*, the court considered whether *DeShaney* precluded plaintiffs' due process claims arising out of untimely transfer from jail to mental hospital and concluded it did not: "*DeShaney* is limited to the question of what a state's obligations are with regard to the protection from harm of a confined or restrained person. It says nothing about how long the state may hold a person in custody solely due to their incompetency to stand trial or their acquittal due to insanity, without addressing their mental state." No. A-16-CV-917-LY, 2017 WL 1611761, at *3 (W.D. Tex. Apr. 28, 2017), *report and recommendation adopted sub nom. Ward By Bourliot v. Hellerstedt*, No. A-16-CV-917-LY, 2017 WL 5202874 (W.D. Tex. June 14, 2017).

This reasoning in *Hellerstedt* is consistent with the general principle that a state may not offload its constitutional obligations, "merely by delegating custodial responsibility to irresponsible private persons, any more than a state could avoid its duty not to impose cruel and unusual punishments by turning over the management of its prisons to private correctional entrepreneurs known to inflict cruel and unusual punishments." *K.H. Through*

---

[4]     State Defendants also cite *Briggs v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs.*, 472 F. Supp. 2d 1304, 1313 (W.D. Okla. 2007), which explained that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* (internal quotation omitted). Like *DeShaney*, *Briggs* does not support the State Defendants' position. Again, this case does not involve "private violence."

*Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990) (internal citations omitted); *see also*

*A.M. ex rel. Youngers v. New Mexico Dep't of Health*, 65 F. Supp. 3d 1206, 1269 (D.N.M.

2014) ("*Youngberg v. Romeo* put the state and its agents on notice that they had to provide

substantive due-process protections to all developmentally disabled individuals

involuntarily committed to state custody—regardless of their physical location.").  It makes

no sense – and the case law does not support – excusing a state from its constitutional

responsibilities toward committed individuals simply because the state has delegated

physical custody of the committee to another agency or person.

Scott County Judge Christian Wilton rejected a similar argument about physical

custody in the Minnesota state case of *Ly v. Harpstead*, which involved a civilly committed

individual's mandamus petition requesting transfer from jail to a DHS facility.  Judge

Wilton found that upon Mr. Ly's commitment order, "the Commissioner of Human

Services became responsible for providing Mr. Ly with the necessary care for his mental

illness and a clear duty attached for the Respondent Commissioner to timely transfer Mr.

Ly to one of the Commissioner's treatment facilities within 48 hours of his commitment,

pursuant to Minn. Stat. § 253B.10." Second Riach Dec. Ex. N at 4.  Judge Wilton further

found that even though Ly was housed at the Scott County Jail, "the Commissioner has full

legal custody over Mr. Ly due to his commitment to the Commissioner and so the

Commissioner has the power to designate the facility for his treatment."  *Id.*  Ultimately,

Judge Wilton held that DHS' failure to promptly transfer Ly was "a public wrong that

specifically injures Mr. Ly including through unlawful restraint of his liberty and by

denying him due process, and by causing him harm through a failure to treat his mental illness." *Id.* at 11.

Judge Wilton's decision in *Ly* is consistent with the federal constitutional case law on this issue: DHS has a responsibility to provide substantive due process protections to all involuntarily committed mentally ill individuals entrusted to its care, regardless of their physical location. Plaintiff has been involuntarily committed to DHS custody – indeed, the commitment order states that DHS shall "hold [Plaintiff] safe and secure" for the duration of the commitment. That DHS has left Plaintiff to languish at the ADC during the first six months of the commitment period does not relieve it of its constitutional obligations.

    **2**. **The Commissioner has been deliberately indifferent to Plaintiff's serious medical needs.**

        **a. Plaintiff has demonstrated an objectively serious medical need, of which DHS is well aware.**

State Defendants contend that Plaintiff cannot meet the "objective prong" of the deliberate indifference standard because his mental illness – moderate to severe bipolar/schizoaffective disorder – is not a serious medical need. State Defendants cite *Jones v. Minnesota Dep't of Corr.*, 512 F.3d 478, 482-83 (8th Cir. 2008) to support its argument that a "chronic condition without any urgent or immediate presentation of symptoms" cannot be a serious medical need. But *Jones* involved an undiagnosed medical condition, and the question before the court was whether it would have been obvious to a layperson that the plaintiff had serious medical needs based on the symptoms presented. It

did not stand for the proposition that a medical need is "serious" only when symptoms manifest. *Jones* is inapposite.

Here, unlike in *Jones*, Plaintiff's condition has been diagnosed. He has a serious mental illness – indeed, his illness has been determined to be so severe that he has been committed to State custody for treatment. It is undisputed in the case law – and makes common sense – that bipolar and schizoaffective disorders constitute a "serious medical need" for the purposes of deliberate indifference claims. *E.g., Gunther v. Castineta*, 561 F. App'x 497, 502 (6th Cir. 2014) (holding alleged schizophrenia and paranoia constituted "serious medical need" for purposes of plaintiff's deliberate indifference claim).[5]

 DHS' own forensic psychologist, Dr. Jennifer Harrison, has stated regarding Plaintiff: "Given that [Plaintiff] is currently detained at the Hennepin County Adult Detention Center, there is no current treatment plan in place. . . . it is my professional opinion that [Plaintiff's] prognosis for attaining psychiatric stability is poor absent long-term support and oversight." Dr. Harrison further stated, "it is my professional opinion that [Plaintiff] remains in need of treatment in a setting that offers structure and consistency

---

[5] *See also Taplet v. Brooks*, 432 F. App'x 697, 698 (9th Cir. 2011) (holding undiagnosed schizophrenia constitutes a "serious medical need"); *Bullock v. Dep't of Corr.*, 265 F. App'x 39 (3rd. Cir. 2008) (finding it was undisputed that plaintiff's schizophrenia was a "serious medical need"); *Smith v. Phillips*, No. CIV. A. CV507-006, 2008 WL 4086978, at *3 (S.D. Ga. Sept. 3, 2008) (schizophrenia diagnosis establishes "serious medical need"); *Blaylock v. Cooper*, No. 22-10049, 2023 WL 2520596, at *3 (E.D. Mich. Feb. 27, 2023), *report and recommendation adopted*, No. 22-CV-10049, 2023 WL 2507454 (E.D. Mich. Mar. 14, 2023) ("physician's schizophrenia diagnosis qualifies as a 'serious medical need'"); *Elliott v. Price*, No. 09-CV-596-BBC, 2010 WL 58348, at *2 (W.D. Wis. Jan. 4, 2010) (assuming that plaintiff's bipolar schizophrenia qualified as a "serious medical need").

in programming, supervision and oversight, and access to support from a multidisciplinary treatment team." Doc. 19-1 at 33. Thus, even DHS professionals acknowledge Plaintiff's mental illness constitutes a "serious medical need" necessitating substantial treatment. This prong of the deliberate indifference standard is not legitimately contestable.

### b. DHS' failure to promptly admit Plaintiff reflects its custom and/or policy of deliberate indifference.

State Defendants argue that Plaintiff "presents no evidence that a policy or custom of the Commissioner has led to a party being deliberately indifferent to Plaintiff's mental health needs." But DHS' failure to promptly admit plaintiff is in and of itself an act of deliberate indifference, driven by the agency's longstanding policy and custom of accepting custody of committed individuals despite a chronic lack of beds, resulting in mentally ill individuals languishing untreated in the jail setting.

There is no dispute that DHS knows of Plaintiff's mental illness, the treatment needs outlined in the 60-Report and other records, and the commitment orders. DHS concedes that Plaintiff needs to be transferred to a DHS facility, and that individuals are harmed by remaining in the jail setting while awaiting transfer to a DHS facility. *See* Doc. 23 at 40-41.

Nor does DHS contend that its failure to transfer Plaintiff is unintentional. Rather, its explanation for its intentional decision not to admit Plaintiff is that it cannot do so because it lacks sufficient resources. But the Constitution does not contain an exception for funding issues. If the government endeavors to restrict an individual's liberty – as DHS

has done by holding itself out as willing to accept custody of Plaintiff, and then accepting custody – then it must comply with the Constitution.

Moreover, Plaintiff has set forth ample evidence of the State's policy or custom of failing to transfer civilly committed individuals in its custody to appropriate treatment facilities, including numerous lawsuits and public statements over the past decade decrying the exact agency failures that have left Plaintiff sitting in a jail cell for six months after being civilly committed. *See* Doc. 1 at 44-62.

State Defendants argue that because Hennepin Healthcare sought a *Jarvis* order allowing involuntary delivery of neuroleptic medication to Plaintiff, there has been no deliberate indifference to Plaintiff's mental health needs. It is unclear from State Defendants' brief exactly how this *Jarvis* petition satisfies Plaintiff's need for mental health care, besides providing a backstop in the event he stops taking his medication. Regardless, the DHS psychologist who evaluated Plaintiff explained his need for care as more than just neuroleptic medication. *See* Doc. 19-1 at 33. Moreover, as Plaintiff's expert affidavit explained in detail, the jail setting is inherently contra-therapeutic and exacerbates mental illness. *See, e.g.,* Doc. 2-1 at 6. Plaintiff's ongoing stay at the jail is harming him, and the State's failure to admit him to FMHP despite his serious medical needs constitutes deliberate indifference. *See Oregon Advocacy Center vs.* Mink, 322 F.3d 1101, 1121 n. 11 (9th Cir. 2003) (affirming viability of deliberately indifference claim arising from state hospital's failure to promptly transfer civilly committed individuals from jail).

**B.** **Plaintiff Has Shown a Likelihood of Success on His Claims Under** *Jackson v. Indiana.*

Plaintiff has shown a likelihood of success on his claims under *Jackson v. Indiana*, which provides due process "requires that the nature and duration of commitment [of an incompetent individual] bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. 715, 738 (1972).

State Defendants contend that (1) Plaintiff's allegations are more properly analyzed as a deliberate-indifference claim; (2) jail detention of civilly committed individuals does not *per se* violate due process; and (3) DHS' delay in transferring Plaintiff is reasonably related to a legitimate government purpose, thus excusing the constitutional violation.

Again, these arguments fail. First, Plaintiff has stated a conditions-of-confinement claim under *Jackson v. Indiana*, in addition to his well-pleaded deliberate indifference claim. Second, Plaintiff does not argue that jail detention of a civilly committed individual *per se* violates due process; he does argue – and is likely to succeed – on his claim that his prolonged detention at the ADC, combined with the conditions of his confinement, violates due process. Third, DHS' inability to admit Plaintiff due to lack of resources may be relevant to the public policy prong of *Dataphase*, but it does not relieve DHS of liability for the due process violation here.

### 1. Plaintiff states a *Jackson v. Indiana* claim against State Defendants.

State Defendants argue that Plaintiff has not stated a "conditions of confinement" claim and that Plaintiff's claims are more properly analyzed under the "deliberate indifference" standard because "his challenge is to the alleged lack of mental healthcare

provided during his detention." Doc. No. 23 at 30. This argument minimizes and mischaracterizes Plaintiff's claims against the State Defendants. Plaintiff's claims under *Jackson v. Indiana* derive from the nature and duration of his confinement at the ADC, and the lack of any reasonable relation between that confinement and the purposes for it.

Here, the purpose of Plaintiff's commitment is three-fold: (1) provide him with mental health treatment; (2) restore him to competency, if possible; and (3) protect himself and the community. *See, e.g., Jones v. United States*, 463 U.S. 354, 368 (1983) (explaining purpose of committing individuals as MI&D is both treatment of the individual and protection of the public).

The nature and duration of Plaintiff's confinement at the ADC does not bear any reasonable relation to these purposes. He is receiving no mental health treatment at the jail beyond provision of anti-psychotic medication. There is no effort to restore him to competency. The conditions at the jail, including the lack of access to family, to therapy, and the contra-therapeutic nature of jail incarceration are at odds with providing Plaintiff the mental health care he needs to be mentally healthy, regain competency, and be deemed no longer dangerous to himself or others. It is the particular conditions of Plaintiff's confinement at the ADC, and its duration, that constitute a due process violation, and Plaintiff has stated a viable claim under *Jackson v. Indiana*.

## 2. Plaintiff does not contend that jail detention of civilly committed individuals is *per se* unconstitutional.

State Defendants again mischaracterize Plaintiff as arguing that any pretrial detention of a civilly committed individual violates due process. Plaintiff makes no such claim. Of course, there are numerous circumstances in which limited jail detention of a mentally ill individual is consistent with due process. But here, where Plaintiff was civilly committed six months ago, his need for treatment at FMHP is clear and recognized by DHS' own mental health professionals, and he is being subjected to contra-therapeutic conditions at the ADC, ongoing confinement at the ADC violates due process and can (and does) support a claim under *Jackson v. Indiana*.[6] Such claims are viable and can be brought under circumstances like those here. For example, in *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 945 (E.D. Ark. 2002), the court found that the Arkansas Department of Human Services' failure to promptly transfer committed individuals to the Arkansas State Hospital for treatment violated their due process rights because it subjected them to unconstitutional pretrial punishment.[7] Plaintiff has a viable "nature and duration of

---

[6]     State Defendants cite Judge Tostrud's dismissal order in the *Dalen* case to support their position. But Judge Tostrud did not hold that a punitive confinement claim could not be brought against DHS. He held, rather, that Dalen's allegations were too generalized and non-specific to support a conditions-of-confinement claim. *See Dalen v. Harpstead*, Case No. 23-cv-01877 (ECT/ECW), Doc. 42 at 23. *Dalen* is inapposite and does not support State Defendants' arguments.

[7]     State Defendants suggest that Plaintiff's confinement at jail "appears to be a result of the commitment court's hold order and the criminal court's detention order," and not because of any "condition" by DHS that Plaintiff remain in jail. This argument is disingenuous. Plaintiff has been committed to DHS. The committing court ordered that the Hennepin County Sheriff transport Plaintiff to FMHP to receive treatment. Plaintiff has not been transported because FMHP is unwilling to admit him. Plaintiff continues to languish at the ADC because of State Defendants and no one else.

confinement" claim against DHS that is not predicated on a theory that a *per se* due process violation occurs whenever a civilly committed individual is incarcerated in jail.

### 3. State Defendants' Failure to Admit Plaintiff Is Not Reasonably Related to A Legitimate Government Purpose.

State Defendants contend that DHS' failure to admit Plaintiff (and other civilly committed individuals) is reasonably related to the State's need to ensure safe working conditions for staff and to protect FMHP's license. These concerns arise only because of the purported lack of resources to promptly admit all committed patients. But compensating for a lack of resources is not a "legitimate government purpose" that would excuse imposition of unconstitutionally punitive conditions of confinement. *E.g., C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 907 (S.D. Iowa 2020) ("It has long-been established, however, that lack of funding does not excuse unconstitutional conditions of confinement.") (citing *Finney v. Ark. Bd. of Corr.*, 505 F.2d 194, 201 (8th Cir. 1974)).

State Defendants cite *Glendening as Next Friend of G.W. v. Howard*, No. 22-CV-04032-TC-ADM, 2023 WL 8715814, at *14 (D. Kan. Dec. 18, 2023) to support their argument that allowing Plaintiff to languish at the jail is reasonably related to the legitimate government purpose of compensating for a lack of resources. *Glendening* may be apposite, but it is neither binding nor persuasive here.

In *Glendening,* an unpublished case from the District of Kansas, the court considered whether failure to transfer civilly committed individuals from jail to the hospital violated due process. *Glendening*, 2023 WL 8715814 at *6. The defendant state agency

argued that insufficient resources left it incapable of admitting committed individuals to the state hospital without significant delays. The court essentially made a policy decision that the state's failure was excused by its lack of resources. *Id.* at *11. In reaching this decision, the court acknowledged that at least eight other courts had reached a different conclusion under similar circumstances and found that committed individuals' due process rights had been violated. The court explained that it found those other, non-binding, cases unpersuasive, "because they largely gloss over factors outside the State's control," meaning access to financial resources. *Id* at *10. The Court should decline to adopt the *Glendening* court's reasoning here.[8]

Finally, State Defendants unsuccessfully attempt to distinguish the case law Plaintiff cites to support his claims under *Jackson v. Indiana*. Doc. 23 at 35. State Defendants contend that because Plaintiff was not civilly committed for the purpose of regaining his competency to stand trial, but rather because he has been determined to be mentally ill and dangerous, cases decided under *Jackson v. Indiana* (which dealt with competency restoration) are inapposite. First, State Defendants are incorrect about the purpose of

---

[8]      State Defendants' argument about lack of resources excusing the constitutional violation here appears at odds with arguments made in the *Ly* case. There, during oral argument on petitioner's mandamus petition, DHS argued that mandamus was inappropriate because it cannot be ordered where the state lacks funding to comply. DHS appeared to recognize, however, that the insufficient resources excuse does not apply in the context of constitutional violations: "The Court: 'Okay. So then [DHS] doesn't have the money to act and Mr. Ly sits for how long? Until [DHS] has the money?' Mr. Ikeda: 'In a Writ of Mandamus the question of whether the court can compel action that isn't funded . . . because of separation of powers the answer is, no, that that oversteps the judicial branch's authority. If there is a – if Mr. Ly believes that there's a constitutional violation, that's a different case." Second Riach Dec. Ex. M at 38:10-25; *see also id.* at 47-48 (arguing that petitioner should have brought federal constitutional claims).

Plaintiff's commitment. Plaintiff *has* been committed, in part, for the purposes of competency restoration. *See* Boese Dec. Ex. 19 at 4 (requiring FMHP head to periodically report to the court regarding Plaintiff's competence to stand trial).

Second, to the extent Plaintiff has also been committed as MI&D, this is a distinction without a difference. The cases Plaintiff cite in support of his punitive confinement claim all stand for the proposition that the nature of jail confinement – inherently punitive and contra-therapeutic – when combined with an extensive term of confinement – violate the due process rights of individuals who have been civilly committed for mental health treatment. This due process consideration – only holding individuals in jail long enough to determine whether or not their mental health needs warrant commitment to a mental health facility – applies equally to individuals whose commitment arises from competency restoration and to individuals whose commitment arises from a finding that they are MI&D.

For this reason, *Jackson* applies to individuals committed solely as MI&D. *Jones v. United States*, 463 U.S. 354, 368 (1983) (citing *Jackson*); *see also Ward v. Hellerstedt*, No. A-16-CV-917-LY, 2017 WL 1611761, at *3 (W.D. Tex. Apr. 28, 2017), *report and recommendation adopted sub nom. Ward By Bourliot v. Hellerstedt*, No. A-16-CV-917-LY, 2017 WL 5202874 (W.D. Tex. June 14, 2017) (holding that insanity acquittees committed solely based on their dangerousness to the community stated claim under *Jackson v. Indiana*); *Powell v. Maryland Dep't of Health*, 168 A.3d 857, 874 (Md. 2017) (applying *Jackson* and holding: "Any delay in transferring [a MI&D] defendant to a designated facility pursuant to a commitment order must be reasonable in relation to the purpose of treating the defendant while protecting both the defendant and the public").

The rationale behind the due process protections recognized in *Jackson* applies equally to individuals committed as MI&D, and cases addressing failure to promptly transfer individuals committed solely for competency restoration are directly relevant to the analysis here.

**C.**     **Public Policy Favors an Injunction.**

As detailed above and in Plaintiff's Complaint, DHS purported lack of capacity promptly admit civilly committed individuals has been ongoing for more than a decade. DHS has simply faced insufficient pressure to fix its systemic failure to meet its constitutional obligations to civilly committed individuals. It is in the public's interest to issue this injunction because it is in the public's interest to require that DHS satisfy those obligations or face some consequence for failing to do so.

**CONCLUSION**

Plaintiff has demonstrated ongoing irreparable harm and has shown a fair chance of prevailing – indeed a likelihood of prevailing – on the merits, and the balance of harms and the public interest weigh in favor of granting his Motion. Accordingly, Plaintiff respectfully requests that the Court grant his Motion for Preliminary Injunction and order that the State Defendants admit him to the Forensic Mental Health Program in St. Peter within 72-hours of the issuance of the injunction.

Dated: June 3, 2024

s/ *Kevin C. Riach*

Kevin C. Riach
Attorney ID No. 389277
The Law Office of Kevin C. Riach
125 Main St. SE, Suite 339
Minneapolis, MN 55414
Phone:  612-203-8555

**ATTORNEY FOR PLAINTIFF**