## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| John Doe, | Court File No. 24-CV-1392 (NEB/DTS) |
| Plaintiff, | |
| v. | |
| Hennepin County; Hennepin Healthcare System, Inc.; Laura Sloan, M.D., *in her individual capacity*; Minnesota Department of Human Services Commissioner Jodi Harpstead, *in her official capacity*; KyleeAnn Stevens, M.D., *in her individual capacity*; and Joshua Griffiths, M.D., *in his individual capacity*, | **HENNEPIN COUNTY, HENNEPIN HEALTHCARE SYSTEM, INC., AND LAURA SLOAN, M.D.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** |
| Defendants. | |

---

## INTRODUCTION

Plaintiff John Doe is a mentally ill man who has been detained at the Hennepin County Adult Detention Center ("the ADC" or "the jail") for nearly sixteen months, during which time he was civilly committed to the head of the Minnesota Security Hospital in St. Peter as mentally ill and dangerous. Doe remains at the ADC today, waiting for a bed at St. Peter.

Since his detention in June 2023, ADC medical and detention staff—including Dr. Laura Sloan, who provides psychiatric services to jail detainees—have closely monitored Doe and provided medical and mental health services to him on a consistent basis. They have regularly engaged with Doe, checked on him as frequently as every fifteen minutes

1

to monitor his well-being, prescribed and administered medications to him, transferred him to the Hennepin County Medical Center ("HCMC") for psychiatric care when his mental health deteriorated, and even went so far as to get a court order authorizing them to give Doe neuroleptic medications when he refused to take those medications. Despite these extensive efforts, Doe sued Hennepin County, Hennepin Healthcare System, Inc. ("HHS"), and Dr. Sloan (together, the "County and HHS Defendants"), claiming that they were deliberately indifferent to his medical needs and challenging the conditions of his confinement.

Doe's federal claims—all § 1983 claims—fail as a matter of law, and so should be dismissed. First, they should be dismissed under *Monell* and *City of Canton* because Doe has not identified any specific custom or practice that injured others and him and has not sufficiently pled a failure to properly train. These claims also fail because even when viewed with the benefit of liberal construction, the County and HHS Defendants cannot be said to have been deliberately indifferent to Doe's needs. And finally, Dr. Sloan is entitled to qualified immunity. Once the federal claims are dismissed, Doe's state claims should also be dismissed without prejudice for lack of supplemental jurisdiction.

## FACTUAL BACKGROUND

Doe is a 27-year-old man with "a long history of mental health diagnoses, including anxiety, depression, bipolar disorder, and schizoaffective disorder" who was arrested on June 13, 2023, after stabbing his father six times. (ECF 2 ¶¶ 17-18; ECF 71

¶¶ 17-18; ECF 19 at 2, 4; ECF 19-1 at 20.)[1]  Doe was taken to the ADC and is still there, awaiting transfer to St. Peter.  (ECF 71 ¶¶ 18-19.)

During his nearly sixteen-month stay at the ADC, Doe has been closely monitored by jail personnel and regularly seen by medical providers for various physical and mental health concerns.  Indeed, Doe saw medical providers, including a mental health nurse, the very same day he was admitted to the ADC.  (*Id.* ¶¶ 26, 29-31.)  And in the 64 days between June 13 (when Doe arrived at the ADC) and August 15 (when he was transferred to HCMC), medical providers provided or attempted to provide care to Doe at least thirty separate times—nearly every other day, on average.  (*See generally* ECF 19-3 at 31-109; *see also* ECF 19-1 at 22.)  In addition, jail personnel conducted around-the-clock well-being checks on Doe, checking on him every 15 minutes while he was on suicide precautions.  (*See generally* ECF 19-2 at 1-168.)

During the 64 days between his arrival at the ADC and his transfer to HCMC, Doe declined or refused to take medications, declined medical assistance, refused to speak with providers, and/or engaged in such threatening behavior that medical visits had to be rescheduled.  (*See, e.g.*, ECF 19-3 at 124 (June 13: refused medication and "refus[ed] to answer questions or participate in assessment"), 123 (June 14-15: refused medications), 121 (June 22: "declined to talk to medical and Deputy staff" and "refusing assessments"), 117-18 (July 16: "[a]ttempts have been made to discuss neuroleptic medications to treat

---

[1]     The facts here are drawn from Doe's medical and jail records, which are referenced and quoted in the Complaint and Amended Complaint.  As documents embraced by the pleadings, the Court may consider these records when evaluating a motion to dismiss.  *See, e.g.*, *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526-27 (8th Cir. 2017).

[symptoms], but [Doe] has declined these"), 117 (July 19-20: refused to speak with medical providers); 116 (July 24-25: health assessment rescheduled because a deputy advised medical provider of Doe's "[t]hreatening behavior today"; Doe "displayed no willingness to take medications"), 115 (July 27: deputy indicated it was "[u]nsafe to try nursing health assessment today"), 114 (August 2: Doe "[r]efus[ed] nursing health assessment"); *see also* ECF 19-1 at 22 (observing that Doe "engaged in verbally and physically threatening behaviors towards other inmates and jail staff," including yelling racial slurs and threatening to physically assault others, and, on August 10, "threatened to shoot" his lawyer "in the head" during a visit and said "he hoped she was raped"); ECF 19-2 at 148 (July 17: Doe made "vulgar remarks"), 122 (July 22: Doe had been "verbally harassing staff all day" and called a staff member a "fucking rapist"), 79 (August 1: Doe "continues to use numerous racial slurs and talks about harming other inmates"), 57 (August 6: Doe told a deputy, "you're lying you bitch[] and I'm gonna have you shot for that"), 51 (August 7: Doe engaged in a "vulgar rant").

At other times, Doe responded appropriately, engaged with medical providers, cooperated, and said he was sleeping and eating well and had no health concerns. (*See, e.g.*, ECF 19-3 at 119 (although Doe "made a multitude of paranoid/delusional statements," during a June 23 nursing assessment, he was "overall pleasant and gives no indication of being a danger to himself or others" so the nurse was "[n]ot able to justify sending [Doe] to [Acute Psychiatric Services ("APS")] at HCMC at this time"), 116 (Doe advised a nurse on July 27 that he was doing "well," he had no thoughts of hurting himself, his sleep was "good," and he had no other concerns), 115 (during a July 31

nursing visit, Doe "responded appropriately," was "[c]ooperative," "[e]ngaged," "calm, composed, and forthcoming with interaction," denied suicidal and homicidal ideation, and reported he was "doing well" and "sleeping and eating well").)

On July 12, 2023, a jail deputy "asked for an assessment" because Doe appeared to be "refusing to eat, refusing his medications and refusing to talk to the deputies." (*Id*. at 118; ECF 71 ¶¶ 46-47.) The deputy was "very concerned for [Doe's] wellbeing," who was "minimally interactive" and unable to respond to questions about whether he was suicidal. (ECF 19-3 at 118; ECF 71 ¶ 47.) Doe refused to talk to the nurse, who placed Doe on suicide precautions and scheduled an "urgent provider visit." (ECF 19-3 at 118; ECF 19-2 at 168; ECF 71 ¶ 48.) The nurse returned later that same day to check Doe's vital signs to "assure adequate hydration," but he "was hostile" and "refused" to let the nurse take his vital signs. (ECF 19-3 at 118-19; ECF 71 ¶ 48.)

Dr. Sloan evaluated Doe on July 14. She noted that nurses and deputies had observed "symptoms of psychosis and mania including disorganized behavior, delusions, odd statements … staying up all night (possible decreased need for sleep), and pressured speech." (ECF 19-3 at 125; ECF 71 ¶¶ 52-53.) Dr. Sloan noted Doe was on suicide precautions and "appear[ed] severely depressed." (ECF 19-3 at 126.) Doe told Dr. Sloan he was "not legally obligated to talk to you. I'm not suicidal. I will not hurt you. I'm not violent." (*Id*. at 127.) Dr. Sloan advised Doe that she was "concerned about his eating," but Doe responded, "I eat three meals a day. Let me know when you're done falsifying evidence. This will be used in my court case." (*Id*.) Doe also claimed Dr. Sloan was "not a psychiatrist" and that he was "just fine." (*Id*.)

5

Dr. Sloan noted Doe had several psychiatric diagnoses, a history of polysubstance dependence, "[p]ast hospitalizations and multiple past suicide attempts," and that he had been declining medications and refused to speak with her "further about treatment." (*Id.* at 125, 128-29; ECF 71 ¶ 53.) Although there had been "some concerns about [Doe's food] intake," Dr. Sloan noted that deputies "report that he has been eating and there are multiple wrappers and apple cores in his cell." (ECF 19-3 at 125; ECF 71 ¶ 53.) Given Doe's presentation ("minimal interaction, some possible withdrawal … symptoms, and symptoms of psychosis"), Dr. Sloan concluded there was "[n]o imminent need to transfer to APS today," but that "nursing checks" should continue and that providers should "continue to monitor closely for need for APS transfer and need for medications." (ECF 19-3 at 125; ECF 71 ¶ 53.) Dr. Sloan also "strongly recommend[ed]" that Doe take his medications. (ECF 19-3 at 125.)

Dr. Sloan evaluated Doe again on August 11 and observed that he had been "in jail for 2 months with psychosis and symptoms of mania," "poor self care, and pressured speech" and she noted that deputies "have expressed concern for limited food and fluid intake" and that Doe "might have been "malnourished." (*Id.* at 110-11; ECF 71 ¶ 77.) Dr. Sloan ordered that Doe be transferred to APS at HCMC. (ECF 19-3 at 110.)

Doe was hospitalized at HCMC from August 15-22, 2023. (*See generally id.* at 37-108.) By the time of his discharge from HCMC, Doe's "presentation" had "improve[d]," "[n]o overt psychosis [was] seen," and doctors noted that "[i]mprovement in [his] symptoms [was] likely due to … having received several doses" of the neuroleptic Haldol while in the hospital. (*Id.* at 37.) Indeed, Doe experienced

6

"significant improvement while on" Haldol, "tolerated" the medication without "any negative side effects," was "sleeping well, eating well" and was "able to make his needs known." (*Id*. at 38.)   At the time of Doe's discharge from HCMC, medical providers opted not to seek a *Jarvis* order because of his "willingness to take antipsychotic medications." (*Id*.)   However, Doe's medical providers noted they could seek a *Jarvis* order "if necessary." (*Id*.; *see also id*. at 49 (August 21: since Doe "is agreeable to taking his medications and states that he will continue taking them following discharge we will not file for Jarvis at this time").)

When Doe returned to the ADC on August 22, he appeared "much improved" compared to the time of his transfer, a week earlier, and was "able to engage in a logical conversation about medications." (*Id*. at 36; *see also id*. at 35 (August 24: Doe "responded appropriately" to the medical provider, appeared "calm, relaxed and motivated" during his interaction with the provider, and said he was "doing good," "getting eight hours of sleep every night," and "eating good"); ECF 71 ¶ 83.)

Dr. Sloan met with Doe again on August 25, and noted he was "significantly improved" since her last visit with him on August 11, that Doe was "[c]alm, cooperative, pleasant, organized" and denied "all symptoms of psychosis," and that he was taking Haldol voluntarily. (ECF 19-3 at 2; ECF 71 ¶ 84.)   Because of Doe's improved condition, he was removed from suicide precautions on August 26. (ECF 19-3 at 5.)

Because of Doe's behavior, deputies sometimes "denied his hour out of his cell" and, at other times, Doe "would often decline" time out when offered the opportunity to leave his cell. (ECF 19-1 at 21; *see also, e.g.*, ECF 19-2 at 9, 18, 28, 32, 40, 45, 62, 76,

86, 96, 105, 132, 148, 151, 155, 159, 165, 168-69, 188, 194.)  However, once Doe's condition had stabilized and suicide precautions were lifted, Doe "was more consistently offered his hour out and used it, only refusing seldomly."  (ECF 19-1 at 21; *see also, e.g.*, ECF 19-2 at 211-18.)  In a June 3, 2024, declaration Doe filed in support of his motion for a preliminary injunction, Doe acknowledged that he was outside of his cell "4-5 hours per day."  (ECF 36 ¶ 8.)

Between August 25, 2023, and April 14, 2024 (the date the Complaint was filed),[2] Doe continued to be regularly seen by medical providers and Dr. Sloan.  (*See generally* ECF 19-3 at 4-31, 341-70.)  For example, Dr. Sloan saw Doe on September 22 (where he "denie[d] all symptoms" and his Haldol dosage was changed) and October 27 (where he was "bright, conversant," "significantly improved from last visit" with "no symptoms of psychosis," and had not "missed any doses of Zyprexa").  (*Id.* at 18-20, 25-27.)

The petition seeking Doe's civil commitment was filed on August 7, 2023, and was granted on January 8, 2024.  (ECF 19; ECF 71 ¶ 87.)  Despite Doe's allegations in this case that his mental health was suffering at the ADC, in January Doe opposed being civilly committed because he "has been stable for months, is voluntarily taking his medication, is involved in discussing which anti-psychotic medication will be most helpful to maintain his mental health, and has no symptoms of psychosis."  (ECF 47 at 6, 9.)

---

[2]      Doe does not specifically criticize or base any of his claims on the nature or extent of the medical care he received after Dr. Sloan's August 25 evaluation.  (*See generally* ECF 2, 71.)  The County and HHS Defendants, therefore, provide only a high-level overview of Doe's care after that date.

On January 19, 2024, Dr. Sloan noted that Doe's mood was "good," that he was "[s]leeping okay," and had a "good appetite," but that he had "[s]lightly worse symptoms likely due to him missing 2 doses of Seroquel recently when sleeping." (ECF 19-3 at 342-45.) By February, Doe had stopped taking his medications again. After a February 16 evaluation, Dr. Sloan decided to "petition for Jarvis Order" because Doe had declined his medications for the past week and had been exhibiting "worse symptoms of psychosis," making nurses and deputies "increasing[ly] concerned." (*Id*. at 346-50 (February 7: Doe declined medication, stating, "I do not have a court order to force medications on me. So I refused to take these medications"); February 15: Doe refused medication, again because "there is no[] court order legally forcing me to take it"); *see also* ECF 71 ¶ 102.

Dr. Sloan signed the *Jarvis* petition on February 19, and on February 21, it was discovered that Doe had been diverting medications when a deputy found "a bag full of pills" in Doe's cell. (ECF 25-18; ECF 71 ¶ 104; ECF 19-3 at 351-52.) Dr. Sloan stopped the medications Doe had been diverting but continued another medication, and noted she would "consider restarting" the medications he had been diverting once Doe became "more stable." (*Id.* at 353.) Dr. Sloan saw Doe on March 8, noted he had "improved symptoms of mania and psychosis" and recorded that Doe said, "things are going 'alright.'" (*Id*. at 356-57.) The *Jarvis* order was granted on March 22 and authorized Doe's medical providers to involuntarily administer various neuroleptic medications to him. (ECF 25-18.) Notably, Doe "did not object to the issuance of" the *Jarvis* order. (*Id*. at 1.)

On April 5, Dr. Sloan noted that Doe had "[n]o symptoms [of] mania or psychosis" and that he had been spending his time "resting, reading" and speaking with his family over the telephone "every day." (ECF 19-3 at 364-65.) Doe denied delusions and suicidal/homicidal intent and characterized his appetite as "good." (*Id*. at 365-66.) On April 10, 2024—one week before the Complaint was filed—Doe reported he was "doing well" and was "excited to be transferred to St. Peter Hospital." (*Id*. at 368.) Doe has acknowledged that the State—not Hennepin County, HHS, or Dr. Sloan—exercise "complete and total control" over the "location of" Doe's "confinement" and the timing of his transfer to St. Peter. (ECF 71 ¶ 135 (stating that "DHS … [is] solely responsible for determining" when Doe leaves the jail and that "Hennepin County cannot discharge or otherwise transfer Plaintiff without DHS consent").)

In his declaration, Doe claimed that "the conditions at the ADC are aggravating my mental health issues" because of an alleged "increase[]" in his depression and anxiety. (ECF 36 ¶ 10.) But Doe's declaration did not allege that any of his serious medical conditions were being ignored or otherwise disregarded by Dr. Sloan, HHS medical staff, or jail staff. (*See generally* ECF 36.) Indeed, and as set forth above, the medical records establish that Doe's serious medical conditions were not ignored or otherwise disregarded by the County or HHS Defendants.

## PROCEDURAL HISTORY

Doe filed this action on April 17, 2024. (ECF 1.) He sued the County and HHS Defendants, along with officials with the Minnesota Department of Health (the "State Defendants" or "State"). (*Id*.) Doe filed the operative Amended Complaint on August 9,

2024, alleging the same claims against the County and HHS Defendants as alleged in the original Complaint.  (*See generally* ECF 71.)

Count I asserts a § 1983 deliberate indifference claim against all Defendants for violations of the "Eighth and/or Fourteenth Amendment."  (*Id.* ¶¶ 267-75.)  Doe alleges he "suffered from serious medical needs due to his mental illness and related physical maladies, including exhaustion, malnutrition, and dehydration" and that Defendants were deliberately indifferent to these needs.  (*Id.* ¶¶ 268-75.)  Count VI asserts a similar, if not identical claim, against all Defendants for "inadequate medical care" under § 1983.  (*Id.* ¶¶ 297-300.)   Notably, Doe has not asserted a medical malpractice claim, nor has he served the affidavits required by Minn. Stat. § 145.682.  (*See generally id.*)

Count II is a *Monell*/*City of Canton* claim, which alleges that Hennepin County and HHS had "customs, patterns, or practices" of being deliberately indifferent under the "Eighth and/or Fourteenth Amendment" to Doe's "medical needs, safety, well-being, and welfare of inmates and/or detainees that presented with serious medical and mental health concerns at the jail[.]"  (*Id.* ¶¶ 276-82.)  Doe does not reference any specific policies, patterns, or practices that violate the "Eighth and/or Fourteenth Amendment."  (*See generally, id.*)  Instead, Doe makes general references to alleged policies, patterns, or practices regarding the placement of "mentally ill individuals in solitary confinement, punishing mentally ill individuals by refusing to allow them out of their cells or withholding food or other items as punishment."  (*Id.* ¶ 279.)

Count IV is a § 1983 failure to train claim, alleging that Hennepin County's "training practices for its jail deputies regarding housing, care, treatment and handling of

mentally ill inmates were inadequate." (*Id.* ¶¶ 290-93.) Doe does not specifically allege how County employees were inadequately trained. (*Id.*)

Count VII is a "Due Process–Pretrial Punishment" claim under § 1983 against all Defendants, which alleges that the "conditions of [Doe's] confinement were and are severely detrimental to his safety and wellbeing" and are "punitive" in nature. (*Id.* ¶¶ 301-10.) Count VIII is a "Due Process–Unreasonable Restraint" claim under § 1983, claiming Doe's "prolonged housing in solitary confinement" violated his "freedom from bodily restraint[.]" (*Id.* ¶¶ 311-19.)

Count IX is a claim for "Fourteenth Amendment Equal Protection" against Hennepin County. (*Id.* ¶¶ 320-24.) Doe alleges he is "a member of a protected class of individuals who suffer from mental illness" and that deputies allegedly "punish[ed]" Doe by "revo[king] [his] time out of his cell, and refus[ing] to allow [him] food, based on behaviors arising from [his] mental health issues[.]" (*Id.* ¶ 322-23.)

Finally, Counts X-XII are state law claims for intentional and negligent infliction of emotional distress and for negligent supervision. (*Id.* ¶¶ 325-47.)

On May 7—before Doe filed the Amended Complaint—he filed a motion for a preliminary injunction, seeking an order directing the State to transfer him to the Minnesota Security Hospital in St. Peter. (ECF 15.) The Court granted that motion on July 30 and ordered the State to admit Doe to St. Peter within 72 hours of the order's issuance. (ECF 51.) The State filed an appeal of the preliminary injunction and a motion to stay pending appeal. (ECF 52, 53.) On August 9, the Court denied the State's motion

to stay, restarting the 72-hour clock. (ECF 70.)[3]  The State then filed a motion before the Eighth Circuit to stay pending appeal, which the Eighth Circuit granted. The State's appeal is currently pending.

## <u>LEGAL STANDARD</u>

To survive a Rule 12 motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Iqbal*, 556 U.S. at 678).

When considering a Rule 12 motion, a court may set aside legal conclusions, bare recitations of a claim's elements, and indeterminate factual allegations.  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).  A court may also consider matters of public record and materials that are embraced by the pleadings, including "documents whose contents are alleged in a complaint and whose authenticity no party questions."  *E.g.*, *Zean*, 858 F.3d at 526-27 (citation omitted); *see also, e.g.*, *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

---

[3]     Having been presented only with the then-operative Complaint and preliminary materials, in its July 30 order, the Court found that "Doe has received no mental health treatment in jail" and that Doe's mental health had worsened while at the ADC.  (ECF 51 at 9 (citing ECF 2 ¶¶ 159-60).)  In its August 9 order, the Court made similar findings, adding that the "jail setting appears to be inherently contra-therapeutic and exacerbates mental illness."  (ECF 70 at 6 (citing ECF 2-1 at 6), 10 (citing ECF 1-1).)  These findings appear to be based on Doe's complaint alone, not the documents embraced by the complaint or a complete factual record.

## ARGUMENT

**I.   The Court should dismiss Doe's § 1983 claims against the County and HHS Defendants.**

A.   *Doe fails to state a plausible* Monell *or* City of Canton *claim*.

As an initial matter, without actionable claims against Dr. Sloan (*see* § I(C), *infra*), the federal claims against HHS and the County fail because an entity can be held liable under § 1983 only if there is an underlying constitutional violation by the entity's employee. *See, e.g.*, *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018) ("absent a constitutional violation by [an] employee, there can be no § 1983 or *Monell* liability for the [entity]"). Beyond this, Doe's § 1983 claims against the County and HHS are insufficiently pled and should be dismissed.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents;" instead a government entity can only be liable under § 1983 when "execution of [the entity's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). This is an exacting standard. As the Eighth Circuit has observed, the Supreme Court "has set a high bar for establishing municipal liability under § 1983, and demands careful analysis from district courts, to avoid any risk that liability could be imposed under a theory of respondeat superior" because a "municipality bears responsibility for its own torts, not the torts of its employees." *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017).

14

"A 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). A custom or practice may also be the basis for liability, but only when a plaintiff proves: (1) the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by [municipal] employees;" (2) "[d]eliberate indifference to or tacit authorization of such conduct by [a municipality's] policymaking officials after notice to the officials of that misconduct;" and (3) he was injured "by acts pursuant to [the municipality's] custom, *i.e.*, [proof] that the custom was the moving force behind the constitutional violation." *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998). To prove an unconstitutional custom, a plaintiff must show that "officials had notice of prior incidents of [employee] misconduct and had deliberately failed to act on this knowledge." *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987).

To survive dismissal under *Monell*, a plaintiff must allege specific facts that support the conclusion that an unconstitutional custom existed. *See, e.g.*, *Gherity v. Pfaff*, 216 F. Supp. 3d 975, 979-80 (D. Minn. 2016); *D.B. v. Hargett*, No. 13-2781 (MJD/LIB), 2014 WL 1371200, at *8 (D. Minn. Apr. 8, 2014); *Triemert v. Washington Cnty.*, No. 13-CV-1312 (PJS/JSM), 2013 WL 6729260, at *11-12 (D. Minn. Dec. 19, 2013). Where a plaintiff fails to do so, and instead makes only general allegations about a municipality's custom or policy, his claim should be dismissed. *See, e.g.*, *Hunziker as Tr. for ALH v. Doherty*, No. 20-CV-2188 (NEB/TNL), 2021 WL 3146529, at *4-5 (D. Minn. July 26, 2021); *Gherity*, 216 F. Supp. 3d at 979-82; *Liedtke v. Runningen*, No. 15-cv-3361

15

(JRT/HB), 2016 WL 11491381, at *8 (D. Minn. June 20, 2016); *D.B.*, 2014 WL
1371200, at *7-8; *Triemert*, 2013 WL 6729260, at *11-12.

A municipality may also be liable under § 1983 if "the violation resulted from … a
deliberately indifferent failure to train or supervise." *Jackson v. Stair*, 944 F.3d 704, 709
(8th Cir. 2019); *see also City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). But "the
inadequacy of [employee] training may serve as the basis for § 1983 liability only where
the failure to train amounts to deliberate indifference to the rights of persons with whom
the [employees] come into contact" and "[o]nly where a municipality's failure to train its
employees in a relevant respect evidences a 'deliberate indifference' to the rights of its
inhabitants can such a shortcoming be properly thought of as a [municipality] 'policy or
custom' that is actionable under" § 1983. *Id.*

To state a claim based on a failure to train or supervise, a plaintiff has the
obligation to allege that (1) the municipality's training practices were "inadequate;"
(2) the municipality "was deliberately indifferent to the rights of others in adopting them,
such that the 'failure to train reflects a deliberate or conscious choice by'" the
municipality; and (3) "an alleged deficiency in … training procedures actually caused the
plaintiff's injury." *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (citation omitted,
alterations original); *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Here, Doe's allegations fail to state either a *Monell* or *City of Canton* claim.

1. Doe fails to plausibly allege an unconstitutional policy.

As an initial matter, Doe does not allege any facts to support a claim that
Hennepin County or HHS had an unconstitutional policy that led to a deprivation of his

16

constitutional rights.  If anything, Doe claims that his alleged constitutional deprivations resulted from actions that violated ADC policies, not that those policies were themselves unconstitutional.  (ECF 71 ¶¶ 192-96.)

2. Doe fails to plausibly allege an unconstitutional custom, pattern, or practice.

Instead, Doe makes a "custom" claim, generally alleging that Hennepin County and HHS had "customs, patterns, or practices" of being deliberately indifferent to the medical needs of mentally ill people detained at the ADC.  (ECF 71 ¶¶ 263-66, 276-82.) Doe also claims that the County and HHS have unconstitutional customs regarding the placement of "mentally ill individuals in solitary confinement, punishing mentally ill individuals by refusing to allow them out of their cells or withholding food or other items as punishment."  (*E.g.*, *id.* ¶ 279.)  These allegations are pled in too conclusory a manner to be sufficient on their own because they do not describe any *specific* custom or practice that allegedly caused a violation of Doe's constitutional rights.  *See, e.g.*, *Hunziker*, 2021 WL 3146529, at *4-5 ("The Court agrees that the alleged customs of failing to provide foster children with timely medical or mental health treatment and safe and appropriate foster care placements are insufficient under *Monell*."); *Quinn v. Doherty*, 637 F. Supp. 3d 647, 667 (D. Minn. Oct. 31, 2022) (concluding that the complaint's general references to "similarly situated" families or individuals and the "categorical exclu[sion] of grandparents" from child-protection proceedings were insufficient factual bases on which to plausibly allege a *Monell* claim); *Yang v. City of Minneapolis*, 607 F. Supp. 3d 880, 898 (D. Minn. 2022) (dismissing, on Rule 12, plaintiff's *Monell* claim where plaintiff

"alleged no specific facts pertaining to other instances of misconduct to support a custom"); *D.B.*, 2014 WL 1371200, at *5-6; *Triemert*, 2013 WL 6729260, at *12.

In addition, the Amended Complaint makes more specific allegations relating to the treatment of mentally ill individuals at the ADC, but none of these sufficiently plead the existence of an unconstitutional custom.

First, Doe's Amended Complaint relies on the tragic deaths or serious injuries of other mentally ill individuals at the ADC over the last ten years.  (ECF 71 ¶¶ 216-18, 244-45.)  These individuals died by suicide (*id.* ¶¶ 218, 244-45) or seriously injured themselves (*id.* ¶¶ 216, 218.)  None of these deaths or injuries are anything like Doe's circumstances.  Indeed, Doe does not claim any physical injury—much less a serious or fatal self-inflicted injury—while at the ADC.  As such, these facts are insufficient to plead an unconstitutional custom.  *See, e.g.*, *Hunziker*, 2021 WL 3146529, at *4-5; *Starks v. St. Louis Cnty.*, No. 4:21-CV-435-RLW, 2024 WL 940410, at *16 (E.D. Mo. Mar. 5, 2024) (declining to conclude that twenty or more previous deaths in a large correctional institution were "evidence from which a fact finder could reasonably conclude there was a pattern of unconstitutional acts at the Jail" where there was no evidence "as to the circumstances of these deaths, or even whether they were similar to the circumstances of [the decedent's] death").  Absent allegations that other people were injured by the same specific custom, Doe's claims about his own treatment do not, standing alone, support the existence of a widespread custom, pattern, or practice.  "Generally, an isolated incident … cannot, as a matter of law, establish a municipal policy or custom creating liability

under § 1983." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013); *McGautha v. Jackson Cnty.*, 36 F.3d 53, 57 (8th Cir. 1994).

Second, Doe names other civilly committed individuals awaiting transfer from the ADC to a state treatment facility.  (ECF 71 ¶¶ 214-15, 219, 241.)  But Doe alleges no specific harm to these individuals from their delayed transfer, other than vague claims that some detainees "deteriorated" at the ADC.  (*See, e.g.*, *id.* ¶¶ 219, 225.)  Nor does Doe identify a "clearly identified" and "specific" unconstitutional custom by either the County or HHS that caused harm to these individuals and to him.   Absent such specificity, Doe's allegations fail to state a claim under *Monell*.  *See, e.g.*, *Hunziker*, 2021 WL 3146529, at *4-5; *Gherity*, 216 F. Supp. 3d at 979-80; *D.B.*, 2014 WL 1371200, at *5-6; *Triemert*, 2013 WL 6729260, at *12.

Finally, Doe references public statements made by former Hennepin County Sheriff Richard Stanek and current Sheriff Dawanna Witt.  (ECF 71 ¶¶ 220-21, 225, 236-43, 257.)  Both sheriffs have drawn attention to the lack of available beds in state-operated mental treatment hospitals for people civilly committed as mentally ill and have lobbied for the state to do more.  (*Id.*)  Both have acknowledged that the ADC is not designed to be a mental health treatment facility and that civilly committed people would be best served by being quickly admitted to such a facility.  (*Id.*)  But these statements do not amount to admissions of any unconstitutional conduct by County, ADC, or HHS staff or employees.   As such, they do not support a conclusion that County or HHS policymakers were deliberately indifferent to or tacitly authorized any alleged misconduct, after notice to the officials of that misconduct.  *Harris*, 821 F.2d at 504;

*Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013) (finding a "bare allegation" of municipal deliberate indifference to be "patently insufficient").

Moreover, even if the Amended Complaint's allegations were sufficient to support an allegation of "notice" to policymakers, the sheriffs' vocal advocacy for more mental health support from the state and opposition to legislative changes to the 48-hour rule (ECF 71 ¶¶ 220-22, 225, 236-43, 257) precludes a finding that the sheriffs or any County or HHS policymakers were deliberately indifferent to or tacitly authorized unconstitutional misconduct. *See Wedemeier v. City of Ballwin*, 931 F.2d 24, 26 (8th Cir. 1991) (rejecting a *Monell* claim where "the city's official policy was not ignored – the police chief found the officers violated the policy [on use of force] and disciplined them"); *James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006) (noting that deliberate indifference will only be found if defendants "were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and the officials actually drew that inference.").[4]

---

[4]     The Amended Complaint also includes a litany of irrelevant allegations, relating to mentally ill people detained in facilities other than the ADC (like the Scott County jail), legislative reports about mental health services provided to people in county jails across the state, and the timing of jail deputy well-being checks. (*See, e.g.*, ECF 71 ¶¶ 208, 222, 227-33, 246-55, 259.)  These allegations have nothing to do with the care provided to Doe or others at the ADC, and so fall short of alleging a relevant specific custom of unconstitutional conduct by Hennepin County or HHS employees that decisionmakers were aware of but ignored.

3. <u>Doe fails to plausibly allege that his alleged injuries were caused by the County's failure to supervise or train its employees.</u>

Doe's *City of Canton* claim fails because he has not alleged a sufficiently specific pattern of similar constitutional violations by County employees and makes only generic allegations regarding the County's allegedly unconstitutional training practices.

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (citation and punctuation omitted); *see also Ulrich*, 715 F.3d at 1061 (affirming dismissal of claim where plaintiff alleged inadequate supervision and training practices but supported his claim with only his own arrest and detention). However, the Supreme Court has left open the possibility, "however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.

Doe alleges no facts that support his allegation that Hennepin County violated the Constitution by failing to train and supervise its employees. The Amended Complaint identifies no training or supervision practices that the County employed or failed to employ,[5] alleges no pattern of specific similar constitutional violations by untrained or unsupervised employees, and alleges no facts suggesting a patently obvious constitutional

---

[5]   Indeed, Doe alleges that unnamed employees failed to follow ADC policies and training regarding detainee housing, time in and out of cell, frequency of medical care, barbering services, and cell cleaning. (ECF 71 ¶¶ 191-96.) Since he alleges that relevant policies exist, he tacitly acknowledges that this is not a situation where the County "provided no guidance to its employees." *Perryman v. City of Bloomington*, No. CV 23-1984 (DWF/DTS), 2023 WL 8374283, at *4 (D. Minn. Dec. 4, 2023).

violation caused by a failure to train or supervise employees.   Accordingly, Doe's formulaic *City of Canton* claims are insufficient and should be dismissed.   *See Yang*, 607 F. Supp. 3d at 898-99 (dismissing, on Rule 12, *City of Canton* claim where the complaint offered "no specific facts pertaining to prior instances of a failure to train or discipline that would show the City had notice that its training and supervision were inadequate and likely to result in constitutional violations").

> B.   <u>*Alternatively, Doe has not plausibly alleged that the County and HHS Defendants were deliberately indifferent to his medical needs*</u>.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law … for redress[.]"

42 U.S.C. § 1983.   Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1012 (8th Cir. 1999).

Governments have an "obligation to provide medical care for those whom it is punishing by incarceration" and so deliberate indifference to the serious medical needs of prisoners is unconstitutional.  *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  To "prevail on a claim of constitutionally inadequate medical care," a plaintiff must show that the defendants' conduct amounted to "deliberate indifference to [the plaintiff's] serious medical needs."  *Dulany v. Carnahan*, 132 F.3d 1234, 1237-38 (8th Cir. 1997).   A

showing of deliberate indifference involves both an objective and a subjective component.  *Id*. at 1239; *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The plaintiff must demonstrate that (1) he "suffered objectively serious medical needs" and (2) that the defendant "actually knew of but deliberately disregarded those needs." *Dulany*, 132 F.3d at 1239.[6]

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to a [constitutional violation] only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). There is no dispute that Doe is mentally ill, and the County and HHS Defendants assume for purposes of this motion that Doe has objectively serious medical needs.

Nevertheless, Doe's claim fails the second part of the deliberate indifference test, the subjective prong.  The subjective prong of deliberate indifference is "an extremely high standard," *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), which is "difficult [] to meet." *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999); *see also Rellergert v. Cape Girardeau Cnty.*, 924 F.2d 794, 796 (8th Cir. 1991) (same).

The failure to treat a medical condition does not constitute a constitutional violation unless defendants "knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).  So long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain

---

[6]      This same deliberate indifference standard applies to people who have been civilly committed. *Mead v. Palmer*, 794 F.3d 932, 936 (8th Cir. 2015); *Senty-Haugen v. Goodno*, 462 F.3d 876, 889-90 (8th Cir. 2006).

free to "exercise[e] their independent medical judgment."  *Id.*; *see also Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012) (observing that "although 'the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement'") (citation omitted, alteration original); *Bailey v. Gardebring*, 940 F.2d 1150, 1155 (8th Cir. 1991) (affirming dismissal of § 1983 claims after concluding that failure of prison administrators to provide plaintiff with "the precisely tailored psychiatric treatment he seeks cannot fairly be described as 'deliberate indifference'").

Deliberate indifference "entails a level of culpability equal to the criminal law definition of recklessness," where defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004); *see also Farmer*, 511 U.S. at 835 (stating that "deliberate indifference describes a state of mind more blameworthy than negligence" and that liability under the Constitution "requires 'more than ordinary lack of due care for the prisoner's interests or safety'") (citation omitted); *A.H. v. St. Louis Cnty.*, 891 F.3d 721, 726 (8th Cir. 2018) (observing that deliberate indifference is "'akin to criminal recklessness,' something more than mere negligence") (citation omitted); *Fourte v. Faulkner Cnty.*, 746 F.3d 384, 387 (8th Cir. 2014).  Simply put, an official's "failure to alleviate a significant risk" that they should have seen but did not "cannot … be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Even if the Court concludes the Amended Complaint survives under *Monell* and *City of Canton*, Doe has failed to plausibly allege that any of his objectively serious medical needs were deliberately disregarded by the County or HHS Defendants.  Instead, the medical records and other documents embraced by the Amended Complaint show that Doe was closely monitored by jail personnel and seen by medical providers for physical and mental health concerns on a regular basis.

From the time Doe arrived at the jail on June 13, 2023, until he was transferred to HCMC on August 15, 2023 (the 64-day period over which Doe criticizes his care), he was seen by medical providers on at least thirty separate occasions.  (*See generally* ECF 19-3 at 31-109; *see also* ECF 19-1 at 22.)  During these thirty separate occasions, medical providers attempted to conduct mental health checks (which Doe sometimes refused), dispense medications (which Doe sometimes refused), and check on his well-being.  (*See, e.g.*, ECF 19-3 at 114-19, 121, 123-24.)  On July 12, 2023, jail personnel advised medical staff that they were concerned about Doe's medical condition.  (*Id*. at 118; ECF 71 ¶¶ 46-47.)  This concern was not ignored.  Instead, it prompted a visit by nursing staff and Dr. Sloan and the placement of Doe on suicide precautions (a safety measure to prevent Doe from harming himself).  (ECF 19-3 at 118-19, 125-29; ECF 71 ¶¶ 46-48, 52-53.)  And, once Doe was placed on suicide precautions, he continued to be regularly seen by medical providers, and jail personnel conducted well-being checks every fifteen minutes on an around-the-clock basis for a month before Dr. Sloan had him transferred to HCMC for a week of psychiatric care.  (*See, e.g.*, ECF 19-3 at 110-11, 114, 115-18; s*ee generally* ECF 19-2 at 1-168.)

The medical records establish that Doe's mental health improved after his stay at HCMC.  (*See, e.g.*, ECF 19-3 at 2, 35-38; ECF 71 ¶¶ 83-84.)  After Doe's return to the jail, Dr. Sloan, other HHS medical providers, and jail staff continued to provide care and monitor his well-being on a regular basis.  (*See, e.g.*, ECF 19-3 at 2-31, 341-70.)  Indeed, when Doe opposed the civil commitment proceeding in January, he admitted that he had been "stable for months."  (ECF 47 at 6, 9.)  Even so, Doe continued to be monitored and, in February, Dr. Sloan petitioned for (and obtained) a *Jarvis* order because Doe was diverting, and again refusing to take, his medications.  (ECF 19-3 at 346-53; ECF 71 ¶¶ 102, 104; ECF 25-18.)  Since then, the medical records establish that Doe has been taking his medications and is doing well as he awaits transfer to St. Peter.  (*See, e.g.*, ECF 71 at 364-66, 368.)

While Doe may be understandably frustrated that he has not yet been transferred to St. Peter, he has acknowledged that neither the County nor the HHS Defendants have any control over the timing of his transfer.  (*See* ECF 71 ¶ 135.)  But Doe's frustration with the timing of his transfer to St. Peter should not obscure the fact that his medical needs have never been ignored or otherwise deliberately disregarded by the County, HHS, or Dr. Sloan.  Instead, the medical and jail records Doe filed in this case (and his own arguments in opposition to being committed) establish that he has been closely monitored and that he has received care for his serious medical needs.

Doe seems to take issue with certain aspects of the care he received prior to being hospitalized at HCMC in August 2023, but "nothing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment" and they do not

26

violate the Constitution "when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment."  *Long*, 86 F.3d at 765; *see also Baker v. McCollan*, 443 U.S. 137, 146 (1979) (observing that § 1983 "imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law"); *Estelle*, 429 U.S. at 107 (observing that the exercise of medical judgment "does not represent cruel and unusual punishment" and may "[a]t most" be medical malpractice); *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (observing that an inmate's "disagreement with the course of treatment provided to him is not sufficient basis for an Eighth Amendment violation").  Notably, Doe fails to identify any specific medical care that Dr. Sloan, nursing staff, or jail staff should have provided to him or that they denied him.  (*See generally* ECF 71.)   Further, "[p]risoners do not have a constitutional right to any particular type of treatment," *Long*, 86 F.3d at 765, and "[t]he Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish."  *Jenkins v. Cnty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). To the contrary, "[m]ere negligence or medical malpractice" do not amount to constitutional violations.   *Dulany*, 132 F.3d at 1239.   Medical mistreatment "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106 (affirming dismissal of § 1983 claim against prison medical provider for failure to state a claim); *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008).

At bottom, Doe "has merely expressed his displeasure with the judgment of the medical … personnel involved," but "[d]isagreement with a medical judgment is not sufficient to state a claim for deliberate indifference to medical needs."  *Davis v. Hall*,

992 F.2d 151, 153 (8th Cir. 1993).  Doe's deliberate indifference claims should be dismissed with prejudice.[7]

      C.      *Doctor Sloan is entitled to qualified immunity*.

In addition, Doe's § 1983 claims against Dr. Sloan should be dismissed with prejudice because she is entitled to qualified immunity.

Qualified immunity "ensures that government officials performing discretionary functions 'are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Faulk v. City of St. Louis*, 30 F.4th 739, 744 (8th Cir. 2022) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Public officials are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (citation omitted); *see also Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (observing that "[g]overnment officials are entitled to qualified immunity '[u]nless both of these questions are answered affirmatively'") (citation omitted).

The conduct of a public official violates clearly established law only when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what [he is] doing violates that

---

[7]     The deliberate indifference standard and its analysis apply with equal force to Doe's § 1983 claim for "inadequate medical care" (ECF 71 ¶¶ 297-300).  *See Karsjens v. Lourey*, 988 F.3d 1047, 1051-52 (8th Cir. 2021) (applying deliberate indifference standard to plaintiffs' "inadequate medical care" claim).  Therefore, Doe's "inadequate medical care" claim fails for the same reasons that his deliberate indifference claims fail.

right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations original). Absent Supreme Court precedent, there are three ways by which a plaintiff can show the law is clearly established. First, a plaintiff "may identify existing circuit precedent involving sufficiently similar facts that squarely governs the situation." *L.G. through M.G. v. Columbia Pub. Schs.*, 990 F.3d 1145, 1147 (8th Cir. 2021). Or he "may point to 'a robust consensus of cases of persuasive authority' establishing that the facts of [plaintiff's] case make out a violation of clearly established right." *Id.* at 1147-48. "Finally, a plaintiff may show, in rare instances, that a general constitutional rule applies with 'obvious clarity' to the facts at issue and carries the day for [plaintiff]." *Id.* at 1148. "The principle at the heart of these approaches is that state actors are liable only for transgressing bright lines, not for making bad guesses in gray areas." *Id.* As an "*immunity from suit* rather than a mere defense to liability," qualified immunity is "effectively lost if a case is erroneously permitted to go to trial." *Faulk*, 30 F.4th at 744 (emphasis original).

The qualified immunity standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation omitted). The "accommodation" to protect all but incompetent acts and knowing violations of the law "exists because 'officials should not err always on the side of caution' because they fear being sued." *Id*. (citation omitted). The "clearly established" standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can 'reasonably … anticipate when their conduct

may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations omitted).

As set forth above, Doe's medical needs have not been deliberately disregarded by Dr. Sloan and she has not violated his constitutional rights in any way.  For this reason alone, Dr. Sloan is entitled to qualified immunity.  *See Buckley v. Hennepin Cnty.*, 9 F.4th 757, 765 (8th Cir. 2021) (concluding qualified immunity applied to defendants, affirming dismissal of plaintiff's claims because there was no underlying constitutional violation).

And while it is clear Doe does not want to be in the jail and prefers being transferred to St. Peter, he does not allege with any degree of particularity what other or different medical treatment or care Dr. Sloan should have provided to him over the past fifteen-plus months.  (*See generally* ECF 71.)  Nor does Doe explain how Dr. Sloan allegedly fell short of providing reasonable and appropriate medical treatment and care to him, much less how Dr. Sloan allegedly deliberately disregarded his serious medical needs.  (*See generally id.*)  There is no "clearly established" right to a specific course of medical care and, because Doe has failed to allege with any degree of particularity what medical treatment and care Dr. Sloan should have provided to him, he cannot claim that he had a "clearly established" right to some unidentified care.  *See Boudoin v. Harsson*, 962 F.3d 1034, 1039 (8th Cir. 2020) (observing that "'clearly established law' may not be defined 'at a high level of generality,'" but must instead "be 'particularized' to the facts of the case") (citation omitted); *Long*, 86 F.3d at 765 (stating that "[p]risoners do not have a constitutional right to any particular type of treatment"); *Stevens v. Roy*, No. 16-CV-3807 (JRT/LIB), 2017 WL 8944013, at *15 (D. Minn. June 8, 2017) (dismissing

plaintiff's deliberate indifference claim and observing that the Eighth Amendment "does not require that the precise treatment requested be provided, nor does it require treatment at the time of the patient's choosing.  Rather, it merely requires an absence of deliberate disregard") (citation omitted).

Further, Dr. Sloan has never ignored Doe's medical needs or otherwise maliciously deprived him of care.  *See Harlow*, 457 U.S. at 815 (concluding qualified immunity is inapplicable only if "an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury'") (emphasis original, citation omitted).  Dr. Sloan has instead provided the care Doe has needed for more than a year to become stabilized as he awaits transfer to St. Peter.  The medical records filed by Doe in this lawsuit establish that Dr. Sloan has, among other things, (1) seen Doe on a regular basis; (2) made reasonable and appropriate changes to Doe's medications; (3) encouraged Doe to take his medications; (4) ordered nursing staff to monitor Doe closely; (5) had Doe transferred to HCMC for psychiatric care; and (6) petitioned for a *Jarvis* order when it became clear that Doe was unwilling or unable to stay on his medication.  *See Jolly v. Knudsen*, 205 F.3d 1094, 1097 (8th Cir. 2000) (affirming dismissal of deliberate indifference claim where defendant physician "saw [plaintiff prisoner] on numerous occasions … , attempted various corrective actions, and referred [plaintiff] to a specialist" because the physician's actions "cannot reasonably be said to reflect deliberate indifference").

The proof of the medical treatment and care Dr. Sloan has provided to Doe is in the pudding: Doe has admitted and argued in related cases that he has been medically stable "for months."  (ECF 47 at 6, 9.)  And, when Doe later refused his medication for a period of time, Dr. Sloan obtained a *Jarvis* order to ensure he took his medication.  Doe's admission and the medical records Doe filed in this case establish that his medical care has not been disregarded—deliberately or otherwise—by Dr. Sloan. Instead of "deliberate indifference," the care Dr. Sloan has provided to Doe "demonstrates a deliberate concern for [Doe's] medical well-being," *Haslar v. Megerman*, 104 F.3d 178, 180 (8th Cir. 1997), and she is entitled to qualified immunity.

## II.     The Court should decline to exercise jurisdiction over the state law claims.

The remaining claims in Counts X, XI, and XII are state tort actions alleging intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision. (ECF 71 ¶¶ 325-47.) This Court only has jurisdiction over these claims under the doctrine of pendent jurisdiction. 28 U.S.C. § 1367; *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (stating the original doctrinal considerations for pendency in federal litigation).

If Doe's § 1983 claims are dismissed, as they should be, this Court should dismiss the state claims without prejudice "for resolution to state tribunals." *Gibbs*, 383 U.S. at 726-27 ("[I]f the federal claims are dismissed before trial … the state claims should be dismissed as well."); 28 U.S.C. § 1367(c)(3).[8]

---

[8]     Count XII, for negligent supervision, should also be dismissed for failure to state a claim. Under Minnesota law, since negligent supervision claims are "unambiguously"

## <u>CONCLUSION</u>

For these reasons, the County and HHS Defendants respectfully request that the Court dismiss Doe's federal § 1983 claims with prejudice and dismiss Doe's state claims without prejudice.

---

limited to an employer's duty to prevent bodily harm, it is "well established that a viable negligent-supervision claim must allege physical injury." *Johnson v. Peterson*, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007).

Here, Doe alleges "psychological" and "emotional" injury and "emotional distress." (ECF 71 ¶¶ 345, 347.) But "emotional distress is not a physical injury." *Johnson*, 734 N.W.2d at 278. And although Doe vaguely alleges that Hennepin County "failed to prevent the intentional and negligent infliction of physical injury ... by HCSO deputies," he does not allege that he sustained any physical injury that was directly caused by the care he received at the jail. (ECF 71 ¶ 346; s*ee generally* ECF 71.) So, his negligent supervision claim fails. *Johnson*, 734 N.W.2d at 277-78; *see also Ludwig v. Northwest Airlines, Inc.*, 98 F. Supp. 2d 1057, 1072 (D. Minn. 2000).

Respectfully submitted,

Dated: September 30, 2024             MARY F. MORIARTY
                                      Hennepin County Attorney


By: */s/Kelly K. Pierce*_____
     KELLY K. PIERCE (#0340716)
     Assistant Hennepin County Attorney
     A-2000 Government Center
     300 South Sixth Street
     Minneapolis, MN 55487
     Telephone: (612) 348-5488
     Kelly.Pierce@hennepin.us

     *Attorney for Defendant Hennepin County*


     /s/*Matthew S. Frantzen*
     MATTHEW S. FRANTZEN (#332793)
     Assistant Hennepin County Attorney
     A-2000 Government Center
     300 South Sixth Street
     Minneapolis, MN 55487
     Telephone: (612) 596-0075
     Matthew.Frantzen@hennepin.us

     *Attorney for Defendants Hennepin Healthcare System, Inc., and Laura Sloan, M.D.*